IN the INTEREST OF KELSEY C.R., a person Under the Age of 17:

STATE of Wisconsin, Petitioner-Respondent,

v.

KELSEY C.R., Respondent-Appellant-Petitioner.

Supreme Court

No. 99–3095. *Oral argument March 1, 2001.—Decided May 31, 2001.*

2001 WI 54

(Also reported in 626 N.W.2d 777.)

422

427

For the respondent-appellant-petitioner there were briefs and oral argument by *Susan E. Alesia*, assistant state public defender.

For the petitioner-respondent the cause was argued by *Christian R. Larsen*, assistant attorney general, with whom on the brief was *James E. Doyle*, attorney general.

¶ 1. N. PATRICK CROOKS, J. This case arises out of a stop and pat-down search of Petitioner Kelsey C.R. (Kelsey). Two police officers came upon Kelsey sitting alone after dark in a high-crime neighborhood. The officers were concerned that she was a runaway so they began asking her questions. After Kelsey had responded to a few questions, the police told her to "stay put." Kelsey then fled from the police. The police chased and eventually caught her. The officers detained Kelsey, and had a pat-down search of her person for weapons conducted. The police found a loaded handgun on Kelsey, and she was charged with possession of a dangerous weapon. Kelsey moved the circuit court to suppress the results of the pat-down—the handgun—as evidence. The circuit court

denied her motion and the court of appeals affirmed. We granted Kelsey's petition for review.

¶ 2. To resolve this case, we address three distinct points in the encounter between the police and Kelsey. First, did the police seize Kelsey, thereby invoking her constitutional protection against unreasonable seizures, when they told her to "stay put" but she ran away? Second, was the detention of Kelsey after she fled and the police caught her reasonable? Third, was the pat-down search of Kelsey reasonable?

¶ 3. We hold that the circuit court properly denied Kelsey's motion to suppress the evidence. The police did not seize Kelsey when they told her to "stay put" but she ran away, because she did not yield to the police officers' show of authority. Even if this initial exchange was considered a seizure, it was justified by the police community caretaker function. We further hold that the investigative detention of Kelsey, after she fled from the police, was reasonable because the officers had reasonable suspicion that Kelsey had committed, was committing, or was about to commit, a crime. Lastly, we hold that the pat-down search, or frisk, of Kelsey was reasonable.[1] We conclude that the

---

[1] Four other members of this court, Justices William A. Bablitch, Jon P. Wilcox, David T. Prosser, Jr., and Diane S. Sykes join this conclusion. However, Justices Sykes and Prosser would hold that the pat-down search of Kelsey was reasonable because the police officers had an objectively reasonable need to transport Kelsey in the police car. They, therefore, concur in the result, but not in the conclusion that the officers had reasonable suspicion that Kelsey may be armed and dangerous. Chief Justice Shirley S. Abrahamson and Justice Ann Walsh Bradley, although in disagreement with the mandate, agree with Justices Sykes and Prosser that the officers did not have reasonable suspicion that Kelsey may be armed and dangerous.

frisk was reasonable because the officers had reasonable suspicion that Kelsey may be armed and dangerous. We therefore affirm the court of appeals.

## I

¶ 4. On March 1, 1999, at about 7:40 p.m., darkness had descended on the high-crime neighborhood of Eighth and Mitchell Streets in the City of Milwaukee, when Police Officers Bernard Gonzalez (Gonzalez) and Rafael Rivera (Rivera) observed a juvenile female who appeared to need their help. The officers observed Kelsey sitting in the middle of the block leaning up against a storefront. It was a commercial area, but most of the stores were closed and few people were around. Gonzalez testified at the suppression hearing that it was not a good area, especially for a young female alone at night. In addition, Kelsey appeared to be withdrawn, sitting in a huddled position with her hood up over her head.

¶ 5. The officers were concerned that Kelsey might be a runaway, so they stopped the police car and rolled down the window to ask her a few questions. The officers were on the opposite side of the street from where Kelsey was located. The police car was unmarked, but both officers were wearing their uniforms. Gonzalez asked Kelsey if she was all right. Kelsey responded that she was. Gonzalez asked Kelsey how old she was. Kelsey told him that she was 15. When Gonzalez inquired as to where she lived, Kelsey pointed in a direction and said that she lived over there. Gonzalez then asked Kelsey what she was doing. Kelsey said that she was waiting for a friend. This answer raised Gonzalez's curiosity, because he thought that most people waiting for a friend would be standing on the corner, rather that sitting in the middle of the

block. Gonzalez thought Kelsey's answers were evasive and was still concerned that Kelsey was a runaway, so he told her to "stay put" so he could make a U-turn with the police car to be on the same side of the street as Kelsey and ask her more questions. Kelsey then fled.

¶ 6. After a 30–40 second chase, the officers caught Kelsey. When asked why she ran, Kelsey told the officers that she was afraid, but could not explain why she was afraid. The officers checked a national computer database which indicated that Kelsey was not a runaway. Kelsey provided the officers with her telephone number. Gonzalez called the number and spoke with Kelsey's mother. She told Gonzalez that Kelsey was not a runaway, and asked Gonzalez to bring Kelsey home. In addition, Kelsey's mother told Gonzalez that she could not understand why Kelsey fled the police. At this time Gonzalez decided to issue Kelsey a citation for resisting or obstructing an investigation.[2]

¶ 7. Before the officers placed Kelsey in the police car to take her home, they wanted to perform a pat-down search. Because Kelsey was a female, the officers called for a female officer to conduct the search. The closest female officer was downtown so the officers had to wait about 20 minutes for her to arrive. While they were waiting for the female officer to arrive, Gonzalez described Kelsey as very cooperative. When the female officer arrived, she immediately conducted a pat-down search of Kelsey. During the search, she felt something hard in the front of Kelsey's jeans. When she asked what the object was, Kelsey did not respond. The

---

[2] Gonzalez testified during the motion to suppress hearing that he could not remember when he issued Kelsey the citation. There is no other evidence in the record that a citation for resisting or obstructing an investigation was ever issued.

female officer asked if she could take the object out. Kelsey sighed and said yes. The object was a small, loaded handgun. Kelsey was then taken to the District 2 police station.

¶ 8. The State petitioned for a determination that Kelsey was delinquent based on the possession of a dangerous weapon by a person under 18, in violation of Wis. Stat. § 948.60 (1997–98).[3] Kelsey moved to suppress the evidence found during the pat-down search, claiming that the officers did not have probable cause to arrest her for resisting or obstructing an investigation, and that the officers did not have reasonable suspicion for the investigative detention.

¶ 9. The circuit court denied Kelsey's motion to suppress. The court concluded that there were two stops, one when the officers began asking Kelsey questions, and a second when the officers caught Kelsey after she fled. The court held that the first stop was justified, because the officers had reasonable suspicion that Kelsey was a runaway. The court held that the second stop was justified, because Kelsey fled from the police. The court then determined that the pat-down search of Kelsey was reasonable, because the officers were doing good police work and were concerned with their safety. After the court denied the motion to suppress, Kelsey admitted to being delinquent based on a violation of Wis. Stat. § 948.60. Kelsey then appealed,

---

[3] Wisconsin Stat. § 948.60 provides in pertinent part:

(1) In this section, "dangerous weapon" means any firearm, loaded or unloaded . . .

(2) (a) Any person under 18 years of age who possesses or goes armed with a dangerous weapon is guilty of a Class A misdemeanor.

All subsequent references to the Wisconsin Statutes are to the 1997–98 version unless otherwise indicated.

claiming that the circuit court erroneously denied her suppression motion.

¶ 10. The court of appeals affirmed. First, the court concluded that the initial investigation, when the officers began asking Kelsey questions, was justified by the police community caretaker function, because the officers were concerned that Kelsey might be a runaway. In addition, the court stated that this initial stop was justified by the authority granted to police to take runaways into custody. Second, the court held that the stop of Kelsey, after the police chase, was justified by the fact that Kelsey fled from the police. Third, the court held that the pat-down search of Kelsey was reasonable because it was prudent for the officers to frisk Kelsey before placing her inside the police car. The court concluded that the intrusion of a pat-down search was outweighed by the officers concern for their safety. We granted Kelsey's petition for review.

## II

¶ 11. This case presents three issues. One, did the police officers seize Kelsey, thereby invoking her constitutional protection against unreasonable seizures, when Gonzalez told her to "stay put" but she ran away? Two, was the investigative detention after she fled based on a reasonable suspicion that she had committed, was committing, or was about to commit, a crime? Three, was the pat-down search of Kelsey based on a reasonable suspicion that she may be armed and dangerous?

¶ 12. To resolve the issues presented by this case, we must review the circuit court's denial of Kelsey's motion to suppress evidence. The issues in this case involve the constitutional protection against unreason-

able searches and seizures. The determination of whether there is reasonable suspicion for an investigative detention and a subsequent pat-down search presents a question of constitutional fact. *State v. Martwick*, 2000 WI 5, ¶ 18, 231 Wis. 2d 801, 604 N.W.2d 552. We apply a two-step standard of review to questions of constitutional fact. *Id.* First, we review the circuit court's findings of historical fact and uphold them unless they are clearly erroneous. *Id.* Second, we review the circuit court's determination regarding reasonable suspicion de novo. *Id.* We benefit from the analyses of the circuit court and the court of appeals, however.

## III

¶ 13. The parties make several arguments with respect to the issues before us. The State contends that the initial exchange between the police and Kelsey, when the officers began asking her questions, told her to "stay put" but she ran away, was not a seizure. The State asserts that not all police-citizen encounters are seizures. For example, when a police officer seeks a citizen's voluntary cooperation through non-coercive questions, and does not restrain the citizen's liberty, then no seizure has occurred. By contrast, the State argues that a seizure occurs when a police officer, by the application of physical force, or by a show of authority, has in some way restrained the liberty of a citizen. The State claims that the initial exchange between Kelsey and the police, before Gonzalez told her to "stay put," was not a seizure because the police were just asking her questions in a non-confrontational manner.

¶ 14. The State also argues that no seizure occurred when Gonzalez told Kelsey to "stay put" but she ran away. According to the State, no seizure occurs

when a police officer makes a show of authority to a citizen, but the citizen does not yield to that show of authority. The State claims that Gonzalez made a show of authority by telling Kelsey to "stay put," but Kelsey did not yield to that show of authority, rather, she ran away.

¶ 15. Even if the initial encounter was a seizure, the State contends that it was justified by the police community caretaker function. The State argues, and Kelsey concedes (Resp't-Appellant-Pet'r's Br. at 10), that the police were conducting a bona fide community caretaker function by checking on Kelsey's welfare. The State also argues that the limited privacy intrusion on Kelsey, asking Kelsey to "stay put" so that the officers could determine if she was a runaway, was outweighed by the public interest in the protection of juveniles.

¶ 16. The State addresses the second issue, the constitutionality of the investigative detention after Kelsey fled, only in a footnote in its brief, stating that Kelsey does not challenge the constitutionality of this seizure. The State suggests that Kelsey makes this concession because flight from the police justifies an investigative detention.

¶ 17. With respect to the third issue, the State contends that the pat-down search of Kelsey was reasonable because the officers had reasonable suspicion that Kelsey was armed and dangerous. According to the State, there are specific facts in the record, when judged in the totality of the circumstances, that lead to a reasonable suspicion that Kelsey was armed and dangerous. First, the State argues that a relevant factor is that the pat-down search took place in a high-crime neighborhood. Second, the State argues that we should consider the fact that the pat-down search occurred at

night when few people were around. The State claims that darkness is a factor because most assaults on police occur after dark. Third, the State suggests that Kelsey's flight from the police is perhaps the most important fact supporting the pat-down search, because it indicates that Kelsey had something to hide, like a weapon. In addition to the suspicion Kelsey created by her flight, the State argues that this suspicion was increased, because Kelsey could not adequately explain why she fled.

¶ 18. The State also contends that an additional fact supporting the reasonableness of the pat-down search was the need to place Kelsey in the police car. According to the State, a police officer should be allowed to conduct a pat-down search of a person placed in a police car to guard against an ambush from the back seat. The State argues that the officers had a need to place Kelsey in the police car, due to her mother's request that they bring Kelsey home, and that we should consider this need a factor in the totality of the circumstances justifying the pat-down search.

¶ 19. Kelsey contends that her initial encounter with the police, when Gonzalez told her to "stay put" and she fled, was a seizure and is, therefore, subject to the constitutional requirement of reasonableness. According to Kelsey, none of the justifications offered for this stop render this seizure reasonable.

¶ 20. Kelsey argues that the seizure is not justified, because the officers did not have a reasonable suspicion that some criminal activity was taking, or had taken, place. Kelsey asserts that Gonzalez did not have reasonable suspicion that she was involved in criminal activity, but that he only had a hunch that Kelsey might be a runaway.

¶ 21. Kelsey claims that the officers did not have the statutory authority to take her into custody, because Gonzalez did not have reasonable grounds to suspect that she was a runaway. Kelsey argues that the facts Gonzalez found suspicious were really facts demonstrating innocent conduct. The fact that Kelsey was sitting in the middle of the block could be explained by the fact she that was tired or bored, rather than to indicate that she was lying about waiting for a friend. Kelsey also disputes Gonzalez's claim that her answers to his questions were evasive. Kelsey contends that she gave direct answers to Gonzalez's questions that should have dispelled, rather than increased his suspicion. Kelsey also claims that her presence in a high-crime neighborhood, without additional facts, does not justify an investigative detention.

¶ 22. Kelsey also argues that the initial stop cannot be supported by the police community caretaker function, because the public interest did not outweigh the intrusion on her privacy. Kelsey claims that the public interest in investigating runaways falls on the low end of the scale. Kelsey also argues that there were other alternatives available to the officers besides stopping her, such as asking her more questions or continuing to patrol the neighborhood. In addition, Kelsey contends that the attendant circumstances did not support the stop, because the time of day, and the type of neighborhood, do not lead to a reasonable suspicion that she was a runaway, only to a hunch.

¶ 23. Kelsey claims that this initial stop was illegal, and, therefore, all evidence gathered as result of this stop must be suppressed. If the officers had not illegally stopped her, Kelsey argues that she would not have run, and, therefore, would not have been

searched. Consequently, Kelsey argues that evidence of the gun found in her jeans must be suppressed.

¶ 24. Kelsey argues that this court should reaffirm the objective test for when a seizure occurs. According to Kelsey, a seizure occurs when a reasonable person would not feel free to leave. Kelsey urges us to reject the standard offered by the State, because the State's standard replaces the objective test, based on the officer's conduct, with a subjective test based on a citizen's reaction to that conduct. Under the "free to leave" standard, Kelsey claims that she was seized, because a reasonable person would not have felt free to leave when ordered by the police to "stay put."

¶ 25. Even if we conclude that this initial encounter was a legal stop, Kelsey contends that the pat-down search was unreasonable.[4] The pat-down search was unreasonable because the police did not have a warrant, and there is no exception to the warrant requirement that applies. Kelsey cites examples of the exceptions such as consent and search incident to arrest. Kelsey argues that this was not a consent search, because neither Gonzalez and Rivera, nor the female officer who conducted the search, asked Kelsey for her permission. Kelsey also claims that this was not a search incident to arrest, because there was not an actual arrest.

¶ 26. Kelsey also contends that the pat-down search was not a valid frisk for weapons. According to Kelsey, there are no specific facts in the record that would support a reasonable suspicion that she was armed and dangerous. Kelsey points to the fact that Gonzalez testified that he wanted the search con-

---

[4] Kelsey does not challenge the legality of the investigative detention after she fled from the police and they caught her. (Resp't-Appellant-Pet'r's Br. at 7.)

ducted, because he was going to place her in the police car, not because of any suspicion that she was armed and dangerous. In this case, the search was conducted well before curfew on a person, Kelsey, who was not acting nervous, but instead was described as very cooperative. Kelsey also argues that the fact that she was in a high-crime neighborhood, without other specific facts, does not justify a pat-down search.

¶ 27.　Kelsey also contends that the pat-down search was not justified by the police community caretaker function. Kelsey claims that Gonzalez's decision to issue Kelsey a citation for resisting or obstructing an investigation removes this case from the community caretaker analysis. According to Kelsey, Gonzalez's role as community caretaker ended when he decided to issue Kelsey the citation.

¶ 28.　Kelsey also urges us to reject a blanket-rule permitting a pat-down search of every person placed in a police vehicle. Kelsey argues that no state has adopted such a rule, and that this court has explicitly rejected such a rule. Kelsey claims that a blanket-rule would allow the police to circumvent the reasonableness requirement of the Fourth Amendment by asking a person to sit inside a police car. In addition, Kelsey contends that such a rule would eliminate the Fourth Amendment's requirements for a pat-down search for weapons because an officer would not need reasonable suspicion that a person was armed and dangerous.

IV

¶ 29.　We begin our analysis at the point of the first encounter between the police and Kelsey. We consider whether the police seized Kelsey, when the officers told her to "stay put" but she ran away. If this

initial exchange was a seizure, then it is subject to the reasonableness requirement of both the Fourth Amendment to the United States Constitution and Article I, Section 11 of the Wisconsin Constitution.[5] We ordinarily follow the United States Supreme Court's interpretation of the Fourth Amendment when interpreting Article I, Section 11 of the Wisconsin Constitution. *State v. Griffith*, 2000 WI 72, ¶ 24, n.10, 236 Wis. 2d 48, 613 N.W.2d 72.

¶ 30. Not all police-citizen encounters are seizures. *Florida v. Bostick*, 501 U.S. 429, 434 (1991)(citing *Terry v. Ohio*, 392 U.S. 1, 19, n.16 (1968)). A seizure occurs "when an officer, by means of physical force or a show of authority, restrains a person's liberty." *State v. Harris*, 206 Wis. 2d 243, 253, 557 N.W.2d 245 (1996)(citing *Terry*, 392 U.S. at 19, n.16). Included in this test for a seizure is the requirement that when a police officer makes a show of authority to a citizen, the citizen yields to that show of authority. *California v. Hodari D.*, 499 U.S. 621, 626 (1991).

---

[5] The Fourth Amendment to the United States Constitution states:

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Article I, Section 11 of the Wisconsin Constitution states:

> [t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

¶ 31. In *Hodari D.*, police officers came upon a group of young people huddled around a car. 499 U.S. at 622. The officers were traveling in an unmarked police car, but were wearing jackets with the word "Police" on the front and back. *Id.* When the group saw the officers approaching, they fled. *Id.* at 622–23. This flight raised the officers' suspicion, so they chased the fleeing youths. *Id.* at 623. One of the fleeing youths was Hodari D. *Id.* As one of the officers was chasing Hodari D., he saw Hodari D. [the juvenile] throw away what appeared to be a small rock. *Id.* Shortly thereafter, the officer caught Hodari D. and handcuffed him. *Id.* The "rock" that Hodari D. threw away was later determined to be crack cocaine. *Id.* In the juvenile proceeding that followed, Hodari D. moved the court to suppress evidence of the cocaine. *Id.* The trial court denied his motion without stating a reason. *Id.* The California Court of Appeal reversed, holding that the officer had seized Hodari D. when he saw the officer running after him. *Id.* The court held that this seizure was unreasonable and, therefore, that the evidence of cocaine had to be suppressed. *Id.* The California Supreme Court denied the State's petition for review, but the United States Supreme Court granted certiorari. *Id.*

¶ 32. The United States Supreme Court reversed. *Id.* at 629. By examining dictionary definitions from the early 19th century to the present, the Court concluded that the word "seizure" requires actual physical control. *Id.* at 624. The Court then held that a seizure, when attempted by a show of authority rather than by the application of physical force, does not occur unless the citizen actually yields to the show of authority. *Id.* at 625–26. As an example, the Court stated that a seizure does not occur when an officer yells, "[s]top, in the name of the law," at a fleeing citi-

zen who continues to flee. *Id.* at 626. Accordingly, the Court held that the officer did not seize Hodari D. until he caught him after the chase. *Id.* at 629.

¶ 33. We agree with the State and will follow the *Hodari D.* standard for when a seizure occurs. In order to effect a seizure, an officer must make a show of authority, and the citizen must actually yield to that show of authority. In the present case, Gonzalez did make a show of authority to Kelsey when he told her to "stay put." An officer telling a citizen to "stay put" is similar to an officer telling a citizen "stop, in the name of the law." Kelsey, like Hodari D., did not yield to the officer, when he made the show of authority. *See Hodari D.*, 499 U.S. at 622–23. When Gonzalez told Kelsey to "stay put," she ran away. We, therefore, conclude that no seizure occurred in the present case, until the officers applied physical force to Kelsey, by catching her after the 30–40 second chase.

¶ 34. Even if we considered this initial exchange between the police and Kelsey to be a seizure, it would be reasonable under the police community caretaker function. The community caretaker function provides that the police may act in certain situations which are " 'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.' " *State v. Anderson*, 142 Wis. 2d 162, 166, 417 N.W.2d 411 (Ct. App. 1987)(*Anderson I*)(quoting *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)).[6] Therefore, the police may seize a citizen without a warrant, when the police are performing a

---

[6]*State v. Anderson*, 142 Wis. 2d 162, 166, 417 N.W.2d 411 (Ct. App. 1987) (*Anderson I*), after numerous proceedings not relevant to the analysis of the present case, was reversed on

community caretaker function. *Anderson I*, 142 Wis. 2d at 166 (citing *Cady*, 413 U.S. at 441). However, a seizure conducted under the community caretaker function still must satisfy the reasonableness requirement of the Fourth Amendment. *Anderson I*, 142 Wis. 2d at 167–68.

¶ 35. To determine whether a seizure conducted under the community caretaker function is reasonable, this court must balance "the public need and interest furthered by the police conduct against the degree of and nature of the intrusion upon the privacy of the citizen." *Id.* at 168. In *Anderson I*, the court of appeals fashioned a three-step test to determine if a seizure based on the community caretaker function is reasonable. *Id.* at 169. A court must determine: "(1) that a seizure within the meaning of the [F]ourth [A]mendment has occurred; (2) if so, whether the police conduct was bona fide community caretaker activity; and (3) if so, whether the public need and interest outweigh the intrusion upon the privacy of the individual." *Id.*

¶ 36. We conclude that the three-step *Anderson I* test for a reasonable seizure under the community caretaker function is satisfied in the present case. For step one, we assume for the purpose of this analysis that a seizure within the meaning of the Fourth Amendment occurred. For step two, Kelsey appropriately concedes that the police were, at least at some point, performing a bona fide community caretaker activity by checking to see if Kelsey was a runaway. For step three, we must consider the four relevant factors set forth in *Anderson I* to determine if the public need

other grounds in *State v. Anderson*, 155 Wis. 2d 77, 454 N.W.2d 763 (1990)(*Anderson III*).

and interest outweighed the intrusion on Kelsey's privacy. These four factors are:

> (1) the degree of the public interest and the exigency of the situation; (2) the attendant circumstances surrounding the seizure, including time, location, the degree of overt authority and force displayed; (3) whether an automobile is involved; and (4) the availability, feasibility and effectiveness of alternatives to the type of intrusion actually accomplished.

*Id.* at 169–70.

[11]

¶ 37. These four factors lead us to conclude that step three of the *Anderson I* test is satisfied in the present case. First, the degree of public interest and the exigency of the situation support the reasonableness of the seizure. There is a strong public interest in locating runaway children and juveniles, as evidenced by Wis. Stat. §§ 48.19(1)(d)4 and 938.19(1)(d)4.[7] In addition, the exigency of the situation supports the

---

[7] Wisconsin Stat. § 48.19 provides in pertinent part:

(1) A child may be taken into custody under any of the following:
 (d) Circumstances in which a law enforcement officer believes on reasonable grounds that any of the following conditions exists:
 4. The child has run away from his or her parents, guardian or legal or physical custodian.

Wisconsin Stat. § 938.19 provides in pertinent part:

(1) A juvenile may be taken into custody under any of the following:
 (d) Circumstances in which a law enforcement officer believes on reasonable grounds that any of the following conditions exists:
 4. The juvenile has run away from his or her parents, guardian or legal or physical custodian.

reasonableness of the seizure, because given all the circumstances discussed herein, something bad could have happened to Kelsey had the officers not approached her. A juvenile, alone in a dangerous neighborhood, is vulnerable to kidnappers, sexual predators, and other criminals. Second, the attendant circumstances surrounding the seizure support its reasonableness, because Kelsey was alone, after dark, in a dangerous neighborhood. The degree of overt authority and the force displayed also support the reasonableness of the seizure because the intrusion on her was minimal, demonstrated by the fact that Gonzalez told Kelsey to "stay put," and did not apply any physical force. The third factor does not apply because Kelsey was not in an automobile at the time. Fourth, there were not any alternatives to asking Kelsey to stay where she was to answer some questions, that would have been either feasible or effective in dispelling the officers' concern that Kelsey was a runaway. We, therefore, conclude that, if this initial exchange was a seizure, then it was reasonable under the police community caretaker function.

### V

¶ 38. We now turn to the second encounter between the police and Kelsey, by addressing the question of whether the investigative detention of Kelsey, after she fled, was based on a reasonable suspicion that she had committed, was committing, or was about to commit, a crime, and therefore was reasonable. Even though this issue is uncontested by the parties, it is important to consider the reasonableness of the investigative detention for an understanding of the entire encounter between the police and Kelsey. Further-

more, many of the facts that justify the investigative detention of Kelsey also justify the pat-down search.

¶ 39. As stated above, both the Fourth Amendment to the United States Constitution and Article I, Section 11 of the Wisconsin Constitution protect against unreasonable seizures. An investigative detention is a seizure that requires constitutional protection. *Terry*, 392 U.S. at 16. This protection provides that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Id.* at 22.

¶ 40. Wisconsin law has recognized a *Terry* investigative detention as constitutional. We have adopted the *Terry* standard in *State v. Chambers*, 55 Wis. 2d 289, 294, 198 N.W.2d 377 (1972). In addition, the legislature codified the *Terry* standard in Wis. Stat. § 968.24.[8] To interpret § 968.24, we look to *Terry* and the cases following it, such as *State v. Waldner*, 206 Wis. 2d 51, 55, 556 N.W.2d 681 (1996). In *Waldner*, we stated that, for a police officer to conduct an investigative detention, the officer must possess "specific and articulable facts which would warrant a reasonable belief that criminal activity was afoot." 206 Wis. 2d at

_____

[8] Wisconsin Stat. § 968.24 provides:

After having identified himself or herself as a law enforcement officer, a law enforcement officer may stop a person in a public place for a reasonable period of time when the officer reasonably suspects that such person is committing, is about to commit or has committed a crime, and may demand the name and address of the person and an explanation of the person's conduct. Such detention and temporary questioning shall be conducted in the vicinity where the person was stopped.

55. We review the facts in light of the totality of the circumstances surrounding the detention. *State v. Jackson*, 147 Wis. 2d 824, 833, 434 N.W.2d 386 (1989).

¶ 41. The test for reasonable suspicion that criminal activity is afoot is an objective, common-sense test. *Waldner*, 206 Wis. 2d at 55–56. The test asks "[w]hat would a reasonable police officer reasonably suspect in light of his or her training and experience?" *Id.* at 56 (citing *State v. Anderson*, 155 Wis. 2d 77, 83–84, 454 N.W.2d 763 (1990) (*Anderson III*). This objective, common-sense approach strikes a balance between society's interest in the police preventing and detecting crime, and the individual's privacy interest. *Waldner*, 206 Wis. 2d at 56.

¶ 42. As stated above, we review the circuit court's conclusion that the investigative detention was reasonable with a two-step process. First, we will uphold the court's findings of historical fact unless they are clearly erroneous. *Martwick*, 2000 WI 5, ¶ 18. Second, we review the court's determination of reasonableness de novo. *Id.* The findings of fact relied on by the circuit court to conclude that the investigative detention of Kelsey was reasonable are not clearly erroneous. The circuit court relied on the fact that Kelsey was a juvenile female sitting alone in a dangerous neighborhood. The fact that Kelsey was a minor and was sitting alone in a high-crime neighborhood is undisputed. In addition, the circuit court relied on the way Kelsey was sitting. It is undisputed that Kelsey was sitting in a huddled position with her hood up over her head. The circuit court also found that Kelsey's flight from the police heightened the officers' suspicion. The fact that Kelsey fled when Gonzalez told her to

"stay put" is verified in the record and is undisputed. Upon de novo review, we conclude that the circuit court's determination that Kelsey's appearance, sitting alone in a high-crime neighborhood, her demeanor, sitting in a huddled position with her hood up over her head, and her flight from the police all justified the stop is a correct application of the law. In *Anderson III*, we held that flight from the police, in and of itself, creates reasonable suspicion that criminal activity is afoot. 155 Wis. 2d at 84.

¶ 43. The totality of the circumstances here supports a finding of reasonable suspicion to detain Kelsey. The fact that Kelsey was leaning against a store-front at a time when most of the stores were closed gave the officers reasonable suspicion that something was amiss. It was dark outside, and there were few people around. Criminal activity is more likely under such conditions. A reasonable person in the officers' position would reasonably suspect, based on the totality of these circumstances, that Kelsey had committed, was committing, or was about to commit, a crime. We therefore conclude that the investigative detention of Kelsey was reasonable.

¶ 44. The other requirement for an investigative detention is that it must last only long enough to fulfill the purpose of the stop. *Griffith*, 2000 WI 72 at ¶ 54. In the present case, the purpose of the stop was to either confirm or dispel the officers' suspicion that Kelsey was engaged in criminal activity. The officers asked Kelsey why she fled. Kelsey said she was afraid but did not state why she was afraid. This failure to explain adequately her flight increased the officers' suspicion that criminal activity was afoot. The officers then checked

the computer and called Kelsey's mother to confirm that she was not a runaway. Knowing that Kelsey did not flee because she was a runaway served to increase the officers' suspicion. The officers then decided to conduct a pat-down search of Kelsey for weapons. Because Kelsey was a female, the officers called for a female officer to conduct the search, which is the preferred policy of the Milwaukee Police Department and a reasonable procedure. *See State v. Guy*, 172 Wis. 2d 86, 91, 492 N.W.2d 311 (1992). Because the nearest female officer was downtown, the officers and Kelsey had to wait 20 minutes for the female officer to arrive. Considering the totality of these circumstances, we conclude that the detention of Kelsey lasted only long enough to fulfill the purpose of the stop.

¶ 45. The detention could also be justified by the police community caretaker function. The investigative detention of Kelsey satisfies the three-step *Anderson I* test, set forth above. For step one, there was a seizure of Kelsey. An investigative detention is a seizure. *Terry*, 392 U.S. at 16. For step two, the officers were conducting a bona fide community caretaker activity. Even after Kelsey fled, the officers were still concerned that Kelsey might be a runaway. In fact, Kelsey's flight heightened the officers' suspicion that she was a runaway.

¶ 46. The four factors to be considered under step three of the *Anderson I* test also indicate that the public need and interest outweighed the intrusion on Kelsey's privacy. The analysis of these factors to the investigative detention of Kelsey is nearly identical to the analysis applied to the initial encounter. First, the degree of public interest and the exigency of the situation support the reasonableness of the investigative

detention. There is a strong public interest in locating runaway children, as evidenced by Wis. Stat. §§ 48.19(1)(d)4 and 938.19(1)(d)4. In addition, the exigency of the situation supports the reasonableness of the investigative detention because, as stated above, something bad could have happened to Kelsey had the officers not detained her after she fled. Second, the attendant circumstances surrounding the investigative detention support its reasonableness because Kelsey was alone, after dark, in a dangerous neighborhood. The third factor does not apply because Kelsey was not in an automobile at the time. Fourth, there were not any alternatives to detaining Kelsey that would have been either feasible, or as effective, in dispelling the officers' concern that Kelsey was a runaway. We therefore conclude, after applying the *Anderson I* test, that the investigative detention of Kelsey, following the police chase, was also reasonable under the police community caretaker function.

## VI

¶ 47. We now consider the third point of the encounter between the police and Kelsey by examining whether the pat-down search of Kelsey was based on reasonable suspicion that she might be armed and dangerous. A pat-down for weapons conducted by police, commonly known as a "frisk," is a search. *State v. Morgan*, 197 Wis. 2d 200, 208, 539 N.W.2d 887 (1995). Consequently, a frisk must satisfy the reasonableness requirement of the Fourth Amendment to the United States Constitution and Article I, Section 11 of the Wisconsin Constitution. In *Terry*, the United States Supreme Court balanced a police officer's need for protection from a potentially dangerous citizen, against

the citizen's privacy interest in personal security. 392 U.S. at 23–25. The Court concluded that a police officer may conduct a frisk for weapons if the officer "reasonably believes that his safety may be in danger because the suspect he is investigating may be armed." *State v. McGill*, 2000 WI 38, ¶ 19, 234 Wis. 2d 560, 609 N.W.2d 795 (citing *Terry*, 392 U.S. at 24). The legislature codified this standard in Wis. Stat. § 968.25.[9] As is the case with an investigative detention, the reasonable suspicion for a frisk must be based on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *State v. Richardson*, 156 Wis. 2d 128, 139, 456 N.W.2d 830 (1990)(citing *Terry*, 392 U.S. at 21).

■

¶ 48. The test for reasonable suspicion that a person may be armed and dangerous is an objective test. *Morgan*, 197 Wis. 2d at 209. As stated in *Terry*, the test is "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." 392 U.S. at 27. In addition, the reasonableness of the officer's actions must be judged by considering the totality of the circumstances surrounding the frisk.[10] *Morgan*, 197 Wis. 2d at 209.

---

[9] Wisconsin Stat. § 968.25 provides in pertinent part:

When a law enforcement officer has stopped a person for temporary questioning pursuant to s. 968.24 and reasonably suspects that he or she or another is in danger of physical injury, the law enforcement officer may search such person for weapons or any instrument or article or substance readily capable of causing physical injury and of a sort not ordinarily carried in public places by law abiding persons.

[10] The dissent attempts to analyze the facts in this case separately to justify a conclusion that there is an absence of

¶ 49. In the present case, there are specific and articulable facts in the record to support the conclusion that the frisk of Kelsey by the female officer was reasonable.[11] The same facts that justified the investigative detention of Kelsey after the police chase also justify the frisk. These are: Kelsey fled from the police; Kelsey's initial appearance—sitting in the mid-

reasonable suspicion that Kelsey was armed and dangerous. We are satisfied that the facts must be considered together, not in isolation, in order to apply the totality of the circumstances test, properly. If that is done, it is clear that the pat-down search was reasonable. This approach does not result in a blanket rule, but one that depends on consideration of all of the facts in each case, along with the reasonable inferences which can be drawn from those facts.

[11] The circuit court determined that the pat-down was reasonable because the officers were doing good police work and were concerned for their safety. (Mot. Hr'g at 66.) Although the circuit court concluded that "[t]he evidence in this motion doesn't necessarily support the suspicion that [Kelsey] was armed and dangerous," (Mot. Hr'g at 66) we may consider any fact in the record known to the officers at the time of the frisk. *State v. McGill*, 2000 WI 38, ¶ 24, 234 Wis. 2d 560, 609 N.W.2d 795. The dissent correctly notes the requirement set forth in *McGill* that the facts we rely on must also be supported by the officer's testimony at the suppression hearing. Dissent at ¶ 80. In this case, Officer Gonzalez's testimony at the suppression hearing does support the facts that we rely on to conclude that there was reasonable suspicion. Moreover, the dissent incorrectly states that our conclusion cannot conflict with Officer Gonzalez's testimony that the only reason he ordered the search was because he was going to place Kelsey inside the police car. Dissent at ¶¶ 79–80. As noted above, the test for whether there is reasonable suspicion to support a pat-down search is an objective test, not a subjective one, and, therefore, his reason is not controlling.

dle of the block leaning against a storefront; Kelsey's demeanor in sitting in a huddled position with her hood up over her head; Kelsey's age; it was dark outside and there were few people around. *See McGill*, 2000 WI 38 at ¶ 32 (stating that this court has "consistently upheld protective frisks that occur in the evening hours, recognizing that at night, an officer's visibility is reduced by darkness and there are fewer people on the street to observe the encounter"). In addition, the officer's reasonable suspicion is supported by the fact that the frisk occurred in a high-crime neighborhood. *See Morgan*, 197 Wis. 2d at 211 (holding that "an officer's perception of an area as 'high-crime' can be a factor justifying a search"). We, therefore, conclude that under the totality of the circumstances, the frisk of Kelsey was based on a reasonable suspicion that she was armed and dangerous.

¶ 50.　There are two additional facts that support the frisk of Kelsey. First, Kelsey could not adequately explain why she fled from the police. She told the officers that she was afraid, but did not explain why she was afraid. It was reasonable for the officers to believe that Kelsey fled because she might be hiding a weapon. Second, when Gonzalez called Kelsey's mother, she asked him to bring Kelsey home. When this request was made, the officers had a reasonable basis to place Kelsey inside the police car. Courts in other jurisdictions have included placing someone inside a police car as a factor justifying a frisk for weapons. *See State v. Varnado*, 582 N.W.2d 886, 891 (Minn. 1998)(holding that "when an officer has a valid reasonable basis for placing a lawfully stopped citizen in a squad car, a frisk will often be appropriate without additional individual articulable suspicion"); *State v.*

*Evans*, 618 N.E.2d 162, 167 (Ohio 1993)(holding that "the driver of a motor vehicle may be subjected to a brief pat-down search for weapons where the detaining officer has a lawful reason to detain said driver in the patrol car"); and *People v. Tobin*, 269 Cal. Rptr. 81, 85 (Cal. Ct. App. 1990)(holding that "the need to transport a person in a police vehicle in itself is an exigency which justifies a pat-search for weapons"). As in *Morgan*, this court is not adopting a blanket-rule that a police officer may frisk a person just because the officer is going to place that person inside a police vehicle. 197 Wis. 2d at 215–16. Such a rule might be found to eliminate the constitutional requirement that a search be reasonable. However, we conclude that a reasonable basis to place someone inside a police vehicle is a factor to be considered in the totality of the circumstances, when deciding the reasonableness of a pat-down search.

¶ 51. In summary, we conclude that the circuit court was correct in denying Kelsey's motion to suppress the evidence of the handgun. We conclude that the initial encounter between the police and Kelsey was not a seizure. Even if it was, it was reasonable under the police community caretaker function. We also conclude that the investigative detention of Kelsey was reasonable because the officers had reasonable suspicion that Kelsey had committed, was committing, or was about to commit, a crime. We further conclude that the pat-down search of Kelsey was reasonable, because the officers had reasonable suspicion that she may be armed and dangerous.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 52. DIANE S. SYKES, J. *(concurring)*. I respectfully concur. I agree with the majority's two-part analysis of the stop in this case. However, I agree with the dissent's assessment of the weapons frisk under *Terry v. Ohio*, 392 U.S. 1 (1968), at least insofar as it concludes that the facts of this case do not establish an objectively reasonable suspicion that Kelsey was armed and dangerous.

¶ 53. But that does not end the inquiry. That the facts of this case are insufficient under *Terry* does not necessarily mean that the search was illegal and the gun must be suppressed. It only means that the well-established *Terry* exception to the general rule against warrantless searches does not apply. Other grounds justify the search.

> The touchstone of our analysis under the Fourth Amendment is always "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." Reasonableness, of course, depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers."

*Pennsylvania v. Mimms*, 434 U.S. 106, 108–09 (1977) (citing *Terry*, 392 U.S. at 19, and *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)). This evaluation turns on an assessment of "the degree to which [the search] intrudes upon an individual's privacy and. . .the degree to which it is needed for the promotion of legitimate governmental interests." *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999). *See also State v. McGill*, 2000 WI 38, ¶ 18, 234 Wis. 2d 560, 568, 609 N.W.2d 795 (courts balance "the government's need to

conduct the search against the invasion the search entails" in order to determine its reasonableness).

¶ 54. Applying these general principles of Fourth Amendment law, I would conclude that when a law enforcement officer has an objectively reasonable need or basis to transport an individual in his squad car, the officer's paramount interest in protecting himself against attack by his passenger outweighs the individual's interest in being free from the personal intrusion of a weapons frisk. This is not dependent upon any suspicion that the person being transported is armed and dangerous. *Terry*'s requirement of reasonable suspicion for a weapons frisk in connection with an investigative stop properly balances the relative interests at stake in that sort of police-citizen encounter in the field.

¶ 55. But when an officer is called upon in the course of his duties to transport an individual in a squad car, he necessarily exposes himself to greater risks than in the ordinary field investigation. He will have his hands on the wheel, his eyes on the road, and his back to his passenger, and, as such, is extremely vulnerable to assault, much more so than in an ordinary field investigation. Under these circumstances, I have no difficulty concluding that a weapons frisk, even absent reasonable suspicion that the passenger-to-be is armed and dangerous, is perfectly reasonable under the Fourth Amendment.

¶ 56. This is not to say that I would find *every* search-incident-to-squad-car-ride reasonable. There must be an objectively reasonable need or basis for providing the ride in the first place before the prospective passenger can reasonably be subjected to a weapons frisk. It cannot be pretextual. An officer cannot convert a routine traffic stop or field investigation

into an opportunity to search by conjuring up a reason to provide a ride.

¶ 57. Furthermore, I would not, in this case at least, conclude that it is constitutionally reasonable for an officer to conduct a weapons frisk anytime he merely places a person in a squad car during a traffic stop or field investigation. That, it seems to me, might go too far, and in any event, is not the precise question in this case. Placing someone in a squad car during the course of a traffic stop or field investigation does not necessarily present the substantially higher degree of risk to the officer's safety that giving someone a ride does. Also, the practice is susceptible to greater abuse as a pretext for an otherwise unreasonable search. Pretextual squad car rides, I think, are rare.

¶ 58. I recognize that only a few courts have considered this question, and they are divided in their conclusions. In *United States v. Glenn*, 152 F.3d 1047, 1049 (8th Cir. 1998), the Eighth Circuit held that an officer's decision to place a motorist stopped for a traffic violation in the back of the squad car while running a records check did not independently justify a frisk for weapons. A contrary conclusion, according to the court, "would permit law enforcement officers to pat down all traffic offenders simply by choosing to place them in the back seat of patrol cars during traffic stops." *Id.*

¶ 59. This case, however, involves not a temporary squad car detention but a squad car ride, which considerably heightens the risk to the officer and is less susceptible to the manipulation which concerned the Eighth Circuit Court of Appeals. *Glenn*, therefore, is distinguishable.

¶ 60. *State v. Varnado*, 582 N.W.2d 886, 891 (Minn. 1998), is factually similar to *Glenn*, and the Minnesota Supreme Court reached a similar conclu-

459

sion. The court focused, however, on the unreasonableness of requiring the motorist to wait in the squad car while the records check was being run, and acknowledged that under different circumstances, a frisk might be constitutionally permissible even in the absence of suspicion of armed dangerousness:

> [W]e agree that officer safety is a paramount interest and that when an officer has a valid reasonable basis for placing a lawfully stopped citizen in a squad car, a frisk will often be appropriate without additional individual articulable suspicion. However, the inability of a minor traffic violator to produce a driver's license in and of itself is not a reasonable basis to require the driver to sit in the back of the squad car. We will not allow officers to contravene the reasonableness requirement of the Fourth Amendment simply by requesting that a person sit in the squad car.

*Id.* at 891–92.

¶ 61. The Ohio Supreme Court reached the opposite conclusion in *State v. Evans*, 618 N.E. 2d 162, 167 (Ohio 1993), a case involving a weapons frisk prior to a temporary detention in the back of a squad car. The court upheld the reasonableness of the search for these reasons:

> Here, the officers' pat-down search of defendant was in accordance with standard police procedure which dictates that protective measures be taken before a person is to be held in the back seat of a squad car. . . .Certainly, it is reasonable that the officer, who has a legitimate reason to so detain that person, is interested in guarding against an ambush from the rear. . . .
> We, therefore, find that the police officers' proffered justification in patting down the driver—their

own personal security—is legitimate. When balanced against the driver's minimal privacy interests under these circumstances, we can only conclude that the driver of a motor vehicle may be subjected to a brief pat-down search for weapons where the detaining officer has a lawful reason to detain said driver in the patrol car.

*Id.* (citations omitted). *Evans*, like *Glenn* and *Varnado*, involved frisks incident to temporary squad car detentions, not frisks prior to squad car rides.

¶ 62. In *People v. Otto*, 284 N.W. 2d 273, 276 (Mich. App. 1979), the Michigan Court of Appeals upheld an officer's decision to frisk a hitchhiker prior to transporting him off the freeway. The court focused on the reasonableness of the squad car transport as well as the reasonableness of the frisk, concluding that ticketing the hitchhiker and his companion but leaving them to continue walking on the freeway would have been dangerous and irresponsible, and that the officer's interest in protecting himself from assault while transporting the hitchhikers was legitimate and substantial. *Id.*

¶ 63. Similarly, in *People v. Tobin*, 269 Cal. Rptr. 81, 84 (Cal. Ct. App. 1990), the California Court of Appeals held that an officer's need to transport the occupants of a vehicle that was about to be towed off the freeway justified frisking them for weapons before transporting them. In *Tobin*, a police officer stopped a vehicle for registration irregularities and determined that the driver's license was suspended. The passengers were either unlicensed or apparently intoxicated, and so the car had to be towed. Instead of leaving the driver and his passengers on the freeway, the officer decided to drive them to a restaurant at the next exit where they could be picked up by friends. Before doing

so, however, he frisked them for weapons. The court upheld the search, based upon the exigencies of the situation, in particular, the officer's duty to transport the driver and his passengers since they could not be permitted either to drive or to remain on the freeway on foot. *Id.* at 84.

¶ 64. In finding the search reasonable, the court in *Tobin* distinguished *People v. Scott*, 546 P.2d 327, 332–33 (Cal. 1976). In *Scott*, the California Supreme Court concluded that absent reasonable suspicion of armed dangerousness under *Terry*, an officer may frisk for weapons prior to transporting an individual in a squad car only upon consent of the person to be frisked and transported. In *Scott*, a highway patrol officer came upon the defendant and his young son urinating on an island adjacent to the highway off-ramp. The defendant appeared to be intoxicated and said he was returning his son to his ex-wife. The officer offered to give them a ride, but searched the defendant for weapons first. The court concluded that the search was not incident to arrest and did not meet the criteria of *Terry*, and therefore invalidated it:

> We are not oblivious to the dilemma faced by the conscientious officers under the circumstances of this case. The lateness of the hour, the dangers inherent to pedestrians on a freeway, the presence of a young child, the condition of the defendant, combined to suggest some remedial action was necessary. The officers could have found cause to place defendant under arrest and to take him into custody. A search before transporting the arrestee in the police vehicle would then have been proper. Instead they exercised discretion, perhaps compassion, to avoid arrest. . . .
>
> The dilemma, however, is not insoluble. We are required to accommodate the state's interest in the

safety of police officers who volunteer to give rides not required by their duty, and the individual's right to be secure from unreasonable invasions of privacy. In our view the simple expedient of a warning and option will at once preserve both laudatory objectives. Accordingly, in order for a pat-down search to be valid under these or similar circumstances the officer must first inform the individual that he has a right to refuse the ride but if he accepts it he will be subjected to a pat-down search for weapons. Such a brief admonition will protect both the officer's safety and the individual's right to decide for himself whether he is willing to undergo a pat-down search in order to obtain the offered assistance of the police.

*Id.* The court in *Tobin* essentially found that the squad car ride was not gratuitous but part of the officer's duty under the circumstances of that case, and therefore concluded that it was not subject to the *Scott* requirement of consent to search before transport. *Tobin*, 269 Cal. Rptr. at 84.

¶ 65. The dissent approves the *Scott* approach of " 'the simple expedient of a warning and option,' " dissent at ¶ 94, and some courts have applied variations of it in evaluating the reasonableness of searches in this context. *See People v. Hannaford*, 421 N.W.2d 608 (Mich. Ct. App. 1988); *Village of Pemberville v. Hale*, 709 N.E.2d 227, 229 (Ohio Ct. App. 1998); *Commonwealth v. Rehmeyer*, 502 A.2d 1332 (Pa. Super. Ct. 1985); *People v. Lombardi*, 727 A.2d 670, 674 (R.I. 1999). But I do not believe that the expedient is simple to apply in the field in every case, or that it realistically takes into consideration the full range of circumstances that may give rise to a legitimate need to provide squad car transport. And I do not believe that officers should be encouraged to find cause to arrest where they other-

wise would not in order to justify giving someone a ride in the course of their duties, as the *Scott* court seemed to suggest should have been done in that case.

¶ 66. Simply stated, police officers are sometimes called upon in the course of their duties to transport individuals who are not under arrest. Not all of those individuals will behave in such a way as to give rise to a reasonable suspicion that they are armed and dangerous. Yet they may be. And the risk to the officer's safety is considerably greater during a squad car transport than an investigative stop because the officer cannot watch the passenger's hands and cannot defend against an attack while driving the squad car. Therefore, where, as in *Otto*, *Tobin*, and here, an officer has an objectively reasonable basis to transport a person in a squad car, it is not unreasonable to allow him to protect himself from assault during the transport by conducting a minimally intrusive protective frisk for weapons.

¶ 67. This conclusion does not run afoul of *Richards v. Wisconsin*, 520 U.S. 385 (1997), or *Florida v. J.L.*, 529 U.S. 266 (2000), as the dissent suggests. *Richards* rejected a blanket rule dispensing with the knock and announce rule in the execution of search warrants in all drug cases, and *Florida v. J.L.* declined to adopt a rule that an anonymous tip alleging possession of an illegal gun justifies a *Terry* stop without more. The approach I advocate requires the customary post hoc assessment of reasonableness under the Fourth Amendment in each case, and therefore does not establish a constitutionally impermissible "blanket rule."

¶ 68. Applying this approach, I join with the majority in sustaining the search in this case. Kelsey was a 15-year-old girl alone on the streets at night in early March in an unsafe area of the City of Milwau-

464

kee. The police officers decided, reasonably, that her flight upon their approach, and the brief foot chase that ensued, did not justify an arrest but only a citation for resisting. They further determined, based upon a phone call to her mother, that she was not a runaway. Kelsey's mother asked them to bring her home.

¶ 69. The Juvenile Justice Code specifies that under these circumstances, when a juvenile is detained for a civil offense, the officer "shall make every effort to release the juvenile immediately to the juvenile's parent, guardian or legal custodian." Wis. Stat. §§ 938.19(1)(d)8 and 938.20(2)(ag). Because Kelsey was 15, the officers had the option of releasing her without adult supervision. Wis. Stat. § 938.20(2)(c) ("[i]f the juvenile is 15 years of age or older, the person who took the juvenile into custody may release the juvenile without immediate adult supervision after counseling or warning the juvenile as may be appropriate"). But under the circumstances of this case, and with a specific request from Kelsey's mother that they transport her home, the officers reasonably rejected that option in favor of complying with the mother's request as well as the statute's command that they "make every effort" to return Kelsey to her parent.

¶ 70. Indeed, the facts of this case demonstrate the impracticality of the *Scott* approach across the wide spectrum of police duties and responsibilities. Kelsey was a vulnerable 15-year-old girl who would have been at risk of harm if the police had left her alone at night in an unsafe neighborhood. Her wishes may or may not have coincided with her mother's. Leaving it to Kelsey to decide whether she wanted the ride and the accompanying search would have violated her mother's request and better judgment and the statute's prefer-

ence in this situation for returning juveniles to their parents.

¶ 71. There was an entirely reasonable and legal basis for this particular squad car ride. It was not a pretext to conduct an otherwise unreasonable search. Under these circumstances, and upon this independent basis—even absent a reasonable suspicion that Kelsey was armed and dangerous under *Terry*—I would find the officer's protective frisk for weapons constitutionally reasonable.

¶ 72. I am authorized to state that Justice DAVID T. PROSSER joins this concurring opinion.

¶ 73. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE *(dissenting)*. Today's decision again affirms the constitutional requirement that officers must have reasonable suspicion, based on specific and articulable facts, that a suspect is armed and dangerous before conducting a pat-down search for weapons.

¶ 74. But while paying lip service to this constitutional requirement, today's decision so waters down the reasonable suspicion standard that the majority opinion is in effect adopting the unconstitutional blanket rule proffered by the circuit court and court of appeals that the pat-down search of Kelsey was reasonable because it was prudent for the officers to frisk Kelsey before placing her inside the squad car.

I

¶ 75. The absence of reasonable suspicion that the suspect in this case was armed and dangerous could not be clearer. The officer who ordered the search testified that the *only* reason he wanted to search the suspect was because he was about to place her in the

squad car to take her home. He further testified that it was standard policy to conduct a search before placing an individual in the squad car, although he noted that he usually asks the individual to consent to such a search. He did not explain why he failed to obtain consent to search in this instance.

¶ 76. The circuit court concluded that the officers in question exhibited good, even exemplary, police practice in taking Kelsey home. Nevertheless, the circuit court concluded that the evidence did not support reasonable suspicion that Kelsey was armed and dangerous.

¶ 77. I agree with the circuit court on both counts. In showing concern for a girl huddled alone on the sidewalk, after dark, the officers performed their function as community caretakers. In detaining her to determine whether she was a runaway and contacting her mother, the officers did their utmost to ensure that a vulnerable 15-year-old arrived home safely. The officers are to be commended for these actions.

¶ 78. But under the constitutional standard that has been in place since the U.S. Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1 (1968), an officer must have reasonable suspicion, based on specific and articulable facts, that an individual is armed and dangerous before conducting a pat-down search for weapons. Anything less than this minimum requirement of reasonable suspicion constitutes an unlawful search under the Fourth Amendment.

¶ 79. In this case, there was no reasonable suspicion that Kelsey was armed and dangerous. The officer testified that the only reason he ordered a search was because he was about to transport Kelsey in the squad car, and that it is his policy to always search an individ-

ual for weapons before placing him or her in the squad car.

¶ 80. The majority relies on our statement in *State v. McGill*[1] that we may find reasonable suspicion based on any facts in the record that are known to an officer at the time of a frisk.[2] But *McGill* makes clear that the facts upon which we rely must be "supported by [the officer's] testimony at the suppression hearing."[3] Thus, the majority opinion cannot rely on *McGill* to draw a conclusion that conflicts with the officer's testimony.

¶ 81. The majority justifies the frisk on six factors: (1) Kelsey's initial appearance, sitting on the sidewalk against a building, and her demeanor, sitting in a huddled position with her hood pulled over her head; (2) her age; (3) night time; (4) few people in the area; (5) high-crime area; and (6) Kelsey's fleeing from the officers because she was afraid but could not explain why she was afraid.

¶ 82. First, the officer testified that Kelsey's initial appearance and demeanor made him concerned for her welfare. The majority does not explain how the officer's concerns for Kelsey's welfare, which the officer described in his testimony, are consistent with a reasonable suspicion that she was armed and dangerous, which the officer did not mention in his testimony. The majority merely concludes that the facts that supported the officer's concern for her welfare, thus justifying the detention under the community caretaker function, must have simultaneously supported a suspicion that Kelsey was armed and dangerous.[4]

---

[1] 2000 WI 38, ¶ 24, 234 Wis. 2d 560, 609 N.W.2d 795.

[2] Majority op. at ¶ 49 n.11.

[3] *See McGill*, 2000 WI 38 at ¶ 24.

[4] *See* majority op. at ¶ 49.

¶ 83. What explanation can there be for the unsupported conclusion that a girl who is huddled against a storefront with her hood over her head might reasonably be suspected of being armed and dangerous? As the officer's own testimony shows, these facts are consistent with vulnerability, not dangerousness to others. To conclude that the same facts justifying the stop also justify a suspicion that Kelsey was armed and dangerous is to disregard the tenor of the entire encounter.

¶ 84. Second, the majority says that her age is a factor that would support the officer's unspoken suspicion that she was armed and dangerous. Kelsey was 15 years old. Is a younger or older person less likely to be suspected of being armed and dangerous? The majority opinion does not tell us.

¶ 85. Third, the majority points out that it was nighttime. In *McGill*, 2000 WI 38 at ¶ 32, the court held that darkness was a factor to be considered in determining whether there was reasonable suspicion that a suspect was armed and dangerous, to the extent that the officer's visibility was reduced. Here, however, the officer testified that the area was well lit, so that he could clearly observe Kelsey's face, hair color, and clothing from his patrol car on the opposite side of the street, at a distance of approximately 25 feet.[5] Where an officer testifies that an area is well lit and that an

---

[5] This testimony was necessary for the State's contention that Kelsey knew that she was fleeing police officers, as opposed to strange men approaching her at night in a deserted neighborhood. The squad car was unmarked and the officers did not identify themselves as police officers. However, one of the officers testified that the area was very well lit, so that Kelsey could probably see the officer's uniform at that distance.

individual can be clearly observed, the rationale set forth in *McGill* no longer applies.

¶ 86. Fourth, the fact that few people were around does not give the officers reasonable suspicion that Kelsey was armed and dangerous. At the time of Kelsey's frisk, there were three officers and a single 15-year-old girl, who was quiet and cooperative as she awaited the frisk and a ride home.[6]

¶ 87. Fifth, the majority, like the circuit court, states that the frisk occurred in a high-crime area. This fact is not supported by the record. The officer testified that the area in question had a high rate of graffiti and was "not what [he] would consider a good area especially at night. . .[for] a fifteen year old girl." This testimony is not the equivalent of testimony that they were in a "high-crime area" that would give an officer a reasonable suspicion that an individual encountered in that area might be armed and dangerous.[7]

¶ 88. Sixth, the majority says that Kelsey's flight from the officers supports the reasonable suspicion that she might be hiding a weapon. At best, the majority has identified flight as a factor that supports a suspicion that Kelsey was hiding something. Flight does not, however, support the suspicion that a suspect

---

[6] The officers' vulnerability under these facts is a far cry from *McGill*, in which this court found reasonable suspicion to frisk where an officer, acting alone and without backup, stopped a nervous and apparently intoxicated man. *McGill*, 2000 WI 38, ¶¶ 32–33.

[7] Even if there were a basis in the record, this factor is of very limited import in a reasonable suspicion analysis. *See Maryland v. Buie*, 494 U.S. 325, 334 n.2 (1990) ("Even in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires reasonable, individualized suspicion before a frisk for weapons can be conducted.").

is hiding a weapon and is dangerous, which is the necessary quantum of suspicion under *Terry*.

¶ 89. The majority's conclusion is directly contradicted by the officers' actions in this case. If the officers suspected that Kelsey was armed and dangerous, they would not have delayed the frisk for twenty minutes while waiting for a female officer. Delay in the frisk is inconsistent with the purpose of a *Terry* frisk, which is to protect the immediate safety interests of officers. If the officers were concerned for their safety, they would have frisked Kelsey immediately. Instead, the female officer arrived twenty minutes after the encounter to find Kelsey sitting calmly on the hood of the squad car. This scene is not consistent with the purpose of a *Terry* frisk. It is consistent with the officer's practice of frisking anyone who rides in the squad car.

¶ 90. In sum, I conclude, as did the circuit court and court of appeals, that there was no basis for reasonable suspicion that Kelsey was armed and dangerous. The majority's effort to spin these facts into reasonable suspicion is contradicted by the officer's own testimony, the circuit court's findings, and common sense.

## II

¶ 91. I now turn briefly to the final factor referred to by the majority: the fact that the officers were about to transport Kelsey in the squad car. This court must reject a per se rule allowing officers to search individuals before placing them in the squad car, the so-called "search incident to squad car ride." Such a rule would run afoul of U.S. Supreme Court case law that has rejected past efforts to do away with the need for specific and articulable facts that support a

reasonable suspicion that an individual may be armed and dangerous.[8]

¶ 92. I conclude that the fact that an individual is about to be transported in a squad car provides no independent basis for establishing reasonable suspicion that an individual is armed and dangerous. While I recognize the added vulnerability that arises when officers place an individual in the back seat of the squad car, the proper mechanism for addressing this vulnerability is to request an individual's consent to search before the individual is transported in the squad car.

¶ 93. According to the testimony in this case, a request for consent to a frisk is already part of normal police practice. The officer testified that he usually seeks consent before conducting a search incident to squad car ride. He further stated that if he does not receive consent, he will not put the individual in the back of the squad car.

---

[8] *See, e.g., Richards v. Wisconsin*, 520 U.S. 385 (1997) (rejecting this court's attempt to create a blanket exception to the knock and announce rule where officers suspect drug dealing); *Florida v. J.L.*, 529 U.S. 266 (2000) (declining to adopt a "firearm exception" to *Terry*).

The concurrence's proposed rule, though narrower than a per se rule for all squad car rides, is untenable nonetheless. Such a rule replaces the necessary Fourth Amendment inquiry of whether the search was reasonable under the particular facts with an inquiry into whether the ride in the squad car was pretextual. *See* Sykes, J., concurrence at ¶ 56.

The concurrence also assumes that a ride in a squad car always creates a greater risk of danger to an officer than a stop. I do not know if this assumption is correct. I would have to know the type of separation, if any, between the driver and the passenger.

472

¶ 94. The officer's testimony reflects exemplary police practice, which strikes a viable balance between an individual's Fourth Amendment rights and an officer's concern for safety. The California Supreme Court has mandated a similar practice in such situations, stating that "the simple expedient of a warning and option will at once preserve both laudable objectives."[9] This practice ensures that searches incident to squad car ride are based on consent, and therefore reasonable under the Fourth Amendment, without compromising officer safety. As the officer in this case testified, if an individual denies consent, "I will not put them in the back of my squad [car]. We will find other ways to do things."

¶ 95. In this case, the officer should have requested consent to search Kelsey before transporting her home in the squad car.[10] Such a rule is more worka-

---

[9] *See People v. Scott*, 546 P.2d 327, 332–33 (Cal. 1976) (an officer who proposes to give a private citizen a lift in the patrol car cannot lawfully subject the individual to a nonconsensual pat-down search for weapons when the individual is not under arrest and the officer has no duty to transport the individual and no reason to believe the individual is armed and dangerous; for a pat-down search to be valid the officer must inform the individual of the right to refuse the ride but that if the ride is accepted a pat-down search for weapons will be conducted).

[10] Whether Kelsey would have consented to the search is not before us, as it is undisputed that Kelsey was not asked for consent. Moreover, the prospect that her refusal to give consent would have conflicted with her mother's wishes assumes that Kelsey's mother would have asked the officers to bring Kelsey home with the knowledge that such a ride would require the officer to search Kelsey. The officer's testimony does not indicate that he informed Kelsey's mother of his policy of searching all occupants of his squad car. Had he informed Kelsey's mother of his policy, there might have been no need for a squad car ride

ble than the majority's undeveloped assertion that the decision to put an individual in a squad car should be "a factor justifying a frisk for weapons."[11] Without more explanation about the significance of this factor, the majority is leaving officers without guidance in determining when a search is justified before placing an individual in a squad car. I conclude that a rule requiring consent under these circumstances provides better guidance to officers and courts and properly protects Fourth Amendment rights.

¶ 96. In sum, two of the factors identified by the majority as justifying the frisk are not supported by the record in this case, and the remaining factors do not give rise to a reasonable inference that the officers reasonably suspected that Kelsey was armed and dangerous.

¶ 97. For the reasons set forth, I dissent. .

---

after all. The prospect of a dilemma for the officers in this case is wholly speculative.

[11] The cases cited by the majority for viewing an individual's transport in a squad car as a factor justifying a frisk do not provide clear support for this holding. For example, in *State v. Varnado*, 582 N.W.2d 886 (Minn. 1998), the court found that the search in question violated the Fourth Amendment when the woman frisked (who had been placed in the squad car) was alone, was cooperative, and did not engage in behavior evoking suspicion that she might be armed and dangerous. The court held that the fact that the search occurred at night and in a high-crime area did not support reasonable suspicion that the woman was armed and dangerous.

In *People v. Tobin*, 269 Cal. Rptr. 81, 83–84 (Cal. Ct. App. 1990), the court of appeals concluded that a "duty to transport" existed, distinguishing the facts of that case from *People v. Scott*, 546 P.2d 327 (Cal. 1976), in which the California Supreme Court rejected a frisk incident to squad car ride rule. The State does not claim a duty to transport in the present case.

¶ 98. I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.