THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. TRAVIS SMITH, Defendant-Appellee.

Second District No. 2—02—0882

Opinion filed January 30, 2004.

148

BYRNE, J., dissenting.

Joseph E. Birkett, State's Attorney, of Wheaton (Martin P. Moltz and Gregory L. Slovacek, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Chelsey Robinson and Maria R. Owens, both of Owens & Robinson, of Chicago, for appellee.

JUSTICE KAPALA delivered the opinion of the court:

Defendant, Travis Smith, was charged by indictment with aggravated unlawful use of a weapon (720 ILCS 5/24—1.6(a)(1), (a)(3)(C) (West 2000)). Defendant moved to quash his arrest and suppress the handgun that was seized from his sleeve, contending that he did not give valid consent for the search of his person. The trial court granted the motion, and the State appeals. We reverse.

## I. FACTS

The following evidence was presented at the suppression hearing.

Kevin Driscoll testified that he has been a Naperville police officer for 18 years. At approximately 3:30 a.m. on February 24, 2002, he followed a vehicle onto Interstate 88 (I-88) from Naper Boulevard. When Driscoll stopped following that vehicle, he commenced a U-turn on I-88 in order to head back into the city. Immediately prior to making the U-turn, Driscoll observed a westbound vehicle pass at a very high rate of speed. Driscoll eventually stopped the westbound vehicle for speeding and failing to signal lane changes. The westbound vehicle was a 20-year-old Chevrolet Malibu with four occupants. Driscoll testified that the traffic stop occurred on I-88 approximately one mile west of Route 59. At that location, I-88 is a tollway with three lanes of traffic in each direction and a 55-mile-per-hour speed limit. Access to the tollway is restricted by a chain-link fence that runs parallel to the roadway. There are no businesses in the vicinity. Driscoll had the driver exit the vehicle, gave him field sobriety tests, and thereafter arrested him for driving under the influence of alcohol (DUI). After placing the driver into custody, Driscoll had the three passengers step out of the vehicle and identify themselves. They were defendant and two brothers, Willie and Edmond Reese. Officer Schnizlein arrived at the scene of the traffic stop to help Driscoll search the vehicle.

Officer Driscoll engaged the three passengers in a conversation as to what they were going to do next. Driscoll said that the purpose of the conversation was to determine if one of the three men could drive the vehicle from the scene. Driscoll gave a preliminary breath test (PBT) to defendant and to one of the Reese brothers. Driscoll explained that the other Reese brother admitted that his driver's license was suspended. The PBTs indicated that both men were unfit to drive. Driscoll explained that he used the PBT on defendant and the Reese brother with the valid driver's license because the men told him that they were sober enough to drive, yet Driscoll opined that they were not acting sober. Driscoll said that the Reese brother with the suspended driver's license was the only passenger who showed signs of being sober. After determining that none of the three passengers could drive the vehicle from the scene, Driscoll informed the men that the vehicle was going to be towed and offered them a courtesy ride to the police station where they could make telephone calls to arrange for transportation. Driscoll also testified that, early on in the conversation with the three passengers, he gave them the option of using their cellular telephone to call someone to come and pick them up from the scene of the traffic stop, if someone could get them quickly enough. The older Reese brother, the intoxicated one, informed Driscoll that they were unable to reach anyone who would come and pick them up. Driscoll testified that defendant was cooperative. Dur-

ing his testimony Driscoll related to the court that it was his understanding that pedestrians are prohibited on the expressway except in emergency situations. Driscoll did not testify that he explicitly prohibited the men from departing on foot or that any of the men asked to do so. Driscoll did not, however, offer walking as an option. Driscoll ultimately turned the situation over to Officer Schnizlein and transported the driver to the police station.

On examination by defense counsel, Driscoll explained that if defendant had asked, he would have been permitted to wait for the tow truck to arrive and to ride from the scene of the traffic stop with the tow truck driver. Driscoll testified that he did not ask defendant if he wanted to do that because he felt that it was not his place and it would be up to the tow truck driver whether he could ride in the tow truck. When asked by defense counsel about the emergency exception to the prohibition of pedestrians on the tollway, Driscoll responded that "[t]hese gentlemen were intoxicated and I couldn't possibly sanction them walking on the expressway." Later Driscoll testified that he was concerned that the three men were going to be hit by someone if they were to walk along the tollway.

Officer Bruce Schnizlein testified that he has been a patrolman with the Naperville police department for over 24 years. On February 24, 2002, between 3 a.m. and 4 a.m., Schnizlein responded to a call by Officer Driscoll to assist at a traffic stop on I-88. When Officer Schnizlein arrived at the scene of the traffic stop, Officer Driscoll was administering field sobriety tests to the driver and there were three passengers inside of the stopped vehicle. After arresting the driver for DUI, Driscoll searched the vehicle while Schnizlein observed the passengers, who were standing behind the vehicle. After completing his search of the vehicle, Driscoll had a conversation with the three passengers. Schnizlein was not party to that conversation. After Driscoll spoke to the passengers, they went back into the stopped vehicle and Driscoll had a conversation with Schnizlein. According to Schnizlein, Driscoll told him that he had informed the passengers that they could accept a courtesy ride to the police station and arrange transportation from there or they could call someone to pick them up at the scene of the traffic stop. Officer Schnizlein's understanding from his conversation with Driscoll was that the passengers could not make arrangements for someone to pick them up at the scene of the traffic stop and that they wanted to go to the police station. When Driscoll left with the driver, the three passengers remained in the stopped vehicle. At that point, Schnizlein requested that an additional officer come to the scene because the passengers were going to be transported to the police station. Schnizlein testified that it was department policy and procedure that anyone entering a squad car be frisked for weapons.

When Officer Carlson arrived, Schnizlein told the passengers that their ride was there and that they would be driven to the police station. Ultimately, Officer Carlson transported the Reese brothers and Schnizlein transported defendant. Schnizlein testified that he asked defendant if he possessed any weapons and then advised him that it was department policy to frisk for weapons before allowing him to ride in the squad car. Defendant said that he had no weapons. When Schnizlein asked defendant if he would submit to the pat-down search, defendant put his hands on the trunk of the car so that he could be searched. Schnizlein said that defendant complied with the pat-down search without objection. While patting down the outside of defendant's clothing, Schnizlein felt a bulge in defendant's left sleeve consistent with a weapon. When Schnizlein asked defendant what it was, defendant said that it was a handgun. Schnizlein recovered a loaded .25-caliber semiautomatic handgun from defendant's sleeve and placed defendant under arrest. Schnizlein insisted that the search was designed only to ensure officer safety during the trip to the station. Schnizlein said that defendants attitude prior to the search was cooperative and polite. Schnizlein testified that the tow truck arrived about the time that he was conducting the pat-down search. Schnizlein never asked defendant if he wanted to be transported in the tow truck rather than being transported to the police station. Schnizlein testified that, prior to conducting the pat-down search, defendant was free to leave the scene of the traffic stop.

Following argument, the trial court asked the assistant State's Attorney to produce the statute, rule, or regulation that prohibits pedestrians on the interstate. The trial court continued the hearing for that purpose.

On the continued hearing date, the State produced some documents, but they are absent from the record. At the hearing, the State cited section 11—1010 of the Illinois Vehicle Code (Vehicle Code), which provides that "[a] pedestrian who is under the influence of alcohol or any drug to a degree which renders himself a hazard shall not walk or be upon a highway except on a sidewalk." 625 ILCS 5/11—1010 (West 2000). The State argued that section 11—1010 prohibited defendant from leaving the scene on foot, and therefore, the search incident to defendant's entry into the squad car was valid. The trial court rejected the argument, noting that there had been testimony only that defendant had failed a PBT and therefore was too intoxicated to drive, but no testimony that defendant was so intoxicated that he could not walk safely. The court stated, "[t]here's no evidence to show any other condition of the defendant that would have rendered him under the influence to a degree which renders himself a hazard upon the roadway."

The State orally moved to introduce additional testimony that defendant was too drunk to walk safely, and the court denied the motion. The court then entered a written order granting defendant's motion to quash the arrest and to suppress evidence. The trial court first determined that by nonverbal action, defendant did in fact consent to the search of his person. The trial court distinguished the facts in the present case from those in *People v. Anthony*, 198 Ill. 2d 194 (2001), where our supreme court found that the defendant's nonverbal acts constituted acquiescence to police authority rather than consent to be searched. The second issue the trial court addressed was whether the actions of the police placed defendant in a position where he had no choice but to accept a courtesy ride from the police. The trial court recognized the fact that defendant had failed a PBT, which indicated a blood-alcohol concentration over the legal driving limit. However, the trial court held that there was no evidence to support a conclusion that defendant was incapable of walking one mile to the Route 59 exit due to intoxication. The trial court determined that there is no law that prohibited defendant from doing so as long as he complied with section 11—1007 of the Vehicle Code (625 ILCS 5/11—1007 (West 2000)), which addresses pedestrians walking on highways. The trial court concluded:

"[W]ithout the defendant having been told that walking to the exit was an option available to him he was placed in a position where he had no choice but to be transported by police vehicle and therefore had to consent to the search. If he had not consented he would not have been transported[;] if he had not been transported the police would not have allowed him to walk on the highway. The defendant was therefore in a catch[-]22 dilemma and had no choice but to consent to the search. As such the court finds that the search under the circumstances was improper and [the] motion [to] suppress is granted."

The State filed a written "Motion to Reconsider People's Motion to Reopen Proofs." The court denied the motion to reconsider, and the State filed a timely certificate of impairment and notice of appeal.

## II. ANALYSIS

On appeal, the State argues that the trial court committed reversible error when it (1) granted defendant's motion to quash the arrest and suppress evidence, and (2) denied the State's motion to reopen proofs. Because we agree with the State's first argument, we need not address the second.

■ Generally, a trial court's ruling on a motion to suppress evidence presents a mixed question of law and fact. *People v. Thomas*, 198 Ill. 2d 103, 108 (2001). The reviewing court upholds the factual

findings and witness credibility determinations of the trial court unless they are against the manifest weight of the evidence. *People v. Gherna*, 203 Ill. 2d 165, 175 (2003). If the reviewing court accepts the factual findings, it reviews *de novo* whether suppression is appropriate under those facts. *Gherna*, 203 Ill. 2d at 175.

## A. Consent

■ Unreasonable searches and seizures are prohibited under the fourth amendment to the United States Constitution (U.S. Const., amend. IV) and article I, section 6, of the Illinois Constitution (Ill. Const. 1970, art. I, § 6). Reasonableness in this context generally requires a warrant supported by probable cause. *Katz v. United States*, 389 U.S. 347, 357, 19 L. Ed. 2d 576, 585, 88 S. Ct. 507, 514 (1967). However, a search conducted with a defendant's voluntary consent but without a warrant does not violate the fourth amendment. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 36 L. Ed. 2d 854, 860, 93 S. Ct. 2041, 2045 (1973). The voluntariness of the consent is a question of fact determined from the totality of the circumstances, and the State bears the burden of proving that the consent was truly voluntary. *People v. Anthony*, 198 Ill. 2d 194, 202 (2001).

We begin our analysis of the voluntariness of defendant's consent to the pat-down search of his person by noting our agreement with the trial court's apparent conclusion that defendant's nonverbal manifestation of his consent to the pat-down search was not involuntary. We refer to the trial court's conclusion as "apparent" because in its memorandum opinion, rather than specifically finding that the consent was voluntary, the trial court wrote only "that the defendant by his action did in fact consent to the search by the officer." For the following three reasons, we believe that the trial court meant that the consent was voluntary. First, in its memorandum opinion the trial court distinguished *Anthony*, where our supreme court held that the defendant's consent was involuntary (*Anthony*, 198 Ill. 2d at 203-04). Second, in ruling on the State's motion to reopen proofs and to reconsider, the trial court referred to defendant's consent as "consensual and valid." Third, when the trial court gave its decision on the motion to suppress it would have been unnecessary to proceed to the second issue, that is, whether the actions of the police placed defendant in a position where he had no choice but to accept a courtesy ride from the police, had the trial court not previously determined that the consent was voluntary. On appeal, defendant argues that his purported nonverbal consent to the pat-down search was an acquiescence to the officer's apparent authority to conduct the search and not voluntary consent.

In *Anthony*, Officer Jeff Barr observed the defendant exit a residence in which he knew that the defendant did not live. *Anthony*, 198 Ill. 2d at 197. Officer Barr called to the defendant, " 'Excuse me sir. Can I talk to you for a minute?' " *Anthony*, 198 Ill. 2d at 198. The defendant stopped and allowed Officer Barr and his partner to approach. *Anthony*, 198 Ill. 2d at 198. Officer Barr asked the defendant what he was doing in the area and who he knew at the residence from which he came. *Anthony*, 198 Ill. 2d at 198. The defendant told Officer Barr that he was there visiting a female named Robbi. *Anthony*, 198 Ill. 2d at 198. The defendant appeared nervous and repeatedly reached into his pants pockets. *Anthony*, 198 Ill. 2d at 198. As a consequence, Officer Barr asked the defendant to please keep his hands out of his pockets for his and his partner's safety. *Anthony*, 198 Ill. 2d at 198. The defendant complied, and Officer Barr asked him " 'if he had anything on him that he shouldn't have, anything like guns, drugs, knives, anything that could hurt [Barr] or [his] partner.' " *Anthony*, 198 Ill. 2d at 198. The defendant said no. *Anthony*, 198 Ill. 2d at 198. When Officer Barr asked the defendant if he would consent to a search of his person, the defendant spread his legs apart and put his hands on top of his head. *Anthony*, 198 Ill. 2d at 198. The search that followed revealed that the defendant possessed a rock of cocaine. *Anthony*, 198 Ill. 2d at 199. After recognizing that the voluntariness of consent is a question of fact determined from the totality of the circumstances (*Anthony*, 198 Ill. 2d at 202), the court held that the State failed to prove that the defendant voluntarily consented to the search of his person (*Anthony*, 198 Ill. 2d at 204). The court concluded that the defendant's nonverbal actions were ambiguous and that it could be inferred that the defendant "submitted and surrendered to what he viewed as the intimidating presence of an armed and uniformed police officer who had just asked a series of subtly and increasingly accusatory questions." *Anthony*, 198 Ill. 2d at 203.

We believe that the *Anthony* decision is distinguishable on its facts from the case at bar and is not controlling. The officers' interaction with defendant and his companions was not investigatory or accusatory in nature. The clear purpose of the questions posed to the men was to determine if any of them could drive the stopped vehicle from the scene. The suggestions and directions given to the men concerned their departure from the scene and were in no way calculated to elicit incriminating responses. Moreover, defendant was informed in no uncertain terms that he would be permitted to leave the scene of the traffic stop and did not have to accept the officer's offer of a courtesy ride. As such, defendant's nonverbal acts manifesting his consent to the pat-down search could not be characterized as a mere acquiescence to authority.

The foregoing conclusion does not end our analysis. In granting defendant's motion to suppress, the trial court concluded that defendant had no other choice but to accept the courtesy ride and consent to the prerequisite pat-down search because the police did not offer defendant the option of departing from the scene on foot. As the trial court's holding recognized, a defendant's consent, albeit voluntary, can be tainted where it is the fruit of an illegal detention. *People v. Brownlee*, 186 Ill. 2d 501, 519 (1999), citing *Florida v. Royer*, 460 U.S. 491, 501, 75 L. Ed. 2d 229, 238-39, 103 S. Ct. 1319, 1326 (1983). Therefore, in analyzing this case it is crucial to identify the type of police-citizen encounter that was occurring at the time defendant gave his consent to the pat-down search.

■ Our supreme court has explained:

"There are, theoretically, three tiers of police-citizen encounters. [Citation.] One tier involves an arrest of a citizen, which action must be supported by probable cause; otherwise, the fourth amendment prohibition against unreasonable seizures is violated. [Citation.] The next tier involves a so-called *'Terry'* stop, a brief seizure that must be supported by a reasonable suspicion of criminal activity to be within acceptable fourth amendment boundaries. [Citation.] The last tier involves no coercion or detention and therefore does not involve a seizure. This tier is commonly known as the community caretaking function ***." *People v. Murray*, 137 Ill. 2d 382, 387 (1990).

■ In this case defendant's encounter with the police shifted among the three tiers. First, there was a lawful *Terry* seizure when Officer Driscoll stopped the vehicle in which defendant was traveling for violations of the Vehicle Code. A passenger in a vehicle stopped by police is seized within the meaning of the fourth amendment. *Whren v. United States*, 517 U.S. 806, 809-10, 135 L. Ed. 2d 89, 95, 116 S. Ct. 1769, 1772 (1996). Therefore, defendant was lawfully seized and detained during the traffic stop.

■ When the traffic stop ended and Officer Driscoll turned his attention to getting the passengers safely home, the nature of the police-citizen encounter changed from a second-tier encounter to a third-tier encounter. The traffic stop ended when Officer Driscoll arrested the driver and concluded his search of the stopped vehicle. Once the traffic stop ended, defendant and the Reese brothers became stranded travelers on the roadside and Officer Driscoll's focus shifted from enforcing the Vehicle Code to discharging his duty to protect the stranded passengers. Once his focus shifted, Officer Driscoll's actions involved no coercion, detention, or criminal investigation. We conclude that the interaction between the stranded travelers and Officer Driscoll became

a third-tier consensual encounter by applying the well-settled rule that a seizure occurs "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 20 L. Ed. 2d 889, 905 n.16, 88 S. Ct. 1868, 1879 n.16 (1968). In determining whether a fourth amendment seizure has occurred, it must be determined whether "if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 64 L. Ed. 2d 497, 509, 100 S. Ct. 1870, 1877 (1980). At the beginning of the police-citizen encounter that followed the traffic stop, defendant was free to leave the roadside by any lawful means. Even before the driver was removed from the scene due to his arrest for DUI, defendant and the Reese brothers were told in the most positive manner that they were free to call someone on a cellular telephone and make arrangements to be picked up at the scene, or they could accept a courtesy ride to the police station and arrange for transportation from that location. A reasonable person so instructed would have believed that he was free to leave.

As explained below, the fact that defendant did not leave the roadside at this point in the encounter was the result of circumstances independent of police conduct and, therefore, there could be no fourth amendment seizure. See *People v. Sellars*, 93 Ill. App. 3d 744, 748 (1981), citing *Burdeau v. McDowell*, 256 U.S. 465, 475, 65 L. Ed. 1048, 1051, 41 S. Ct. 574, 576 (1921) (it is well established that without some government action the fourth amendment is not implicated).

The driver of the vehicle in which defendant was traveling was arrested for driving under the influence of alcohol and obviously could not assist defendant in leaving the scene of the traffic stop. The driver's decision to operate a vehicle in an impaired condition and defendant's decision to travel with such a driver were clearly their own and were circumstances independent of police conduct. Defendant and the Reese brothers were unable to depart in the vehicle in which they arrived because the men were incapable of driving the vehicle. One Reese brother lacked a valid driver's license while defendant and the other Reese brother took PBTs indicating that their breath-alcohol concentrations were in excess of the legal limit to operate a motor vehicle. Clearly, their inability to drive away in the vehicle in which they arrived was the result of their own actions and not the result of any police conduct.

The fact that defendant and the Reese brothers were unable to make arrangements to have someone pick them up at the roadside was also a circumstance independent of police conduct. Defendant and his companions did not successfully follow Officer Driscoll's gratuitous

suggestion that they use their cellular telephone to make arrangements to be picked up. We can only speculate as to why these stranded travelers were unable to avail themselves of this lawful means of leaving the roadside. Perhaps their decision to travel at 3:30 a.m. contributed to their lack of success, and it is possible that the men were without the necessary funds to hire a taxi cab to retrieve them from the roadside. Also, the option that defendant and his companions could have sought a ride in the tow truck, although not suggested by the officers, was a possibility that did not occur to the men or perhaps was discounted based on a prediction that they would not all fit in the tow truck. In any event, the circumstances that caused defendant not to leave the roadside in a vehicle other than the one in which he arrived were independent of any police conduct.

It is true that at some point during this consensual third-tier encounter, defendant's freedom of movement became restricted. Specifically, this occurred when defendant and his companions were unsuccessful in arranging for someone to pick them up at the roadside. At that point defendant's freedom of movement was restricted, at least in part, by Officer Driscoll prohibiting defendant and his companions from driving the vehicle in which they arrived and by Driscoll not offering defendant the option of departing on foot. This case turns on whether that detention was illegal, thereby tainting defendant's voluntary consent to the pat-down search incident to the courtesy ride.

Obviously, Officer Driscoll could not have allowed defendant or his companions to drive the vehicle from the scene and would have been derelict in his duty had he done so. See *Garner v. City of Chicago*, 319 Ill. App. 3d 255, 261-62 (2001); *Banks v. City of Chicago*, 11 Ill. App. 3d 543, 550 (1973) (recognizing that a law enforcement officer has a duty to prevent the commission of crime in his presence). Accordingly, not allowing defendant to depart by driving was not an unlawful detention. As to the walking option, there is no indication in the record that defendant and his companions wanted or attempted to depart on foot, or that they were expressly told by the officers that they could not do so. In fact, defendant did not testify at the suppression hearing and, consequently, did not even claim that he wanted to walk from the scene of the traffic stop. Because the officers did not expressly prohibit defendant's departure on foot, there was no government action implicating the fourth amendment (*Sellars*, 93 Ill. App. 3d at 748) and, therefore, no fourth amendment detention as a result of the officers' failure to advise defendant of this option. Nevertheless, Officer Driscoll did testify that he would not have allowed the men to depart on foot. To the extent that his not offering the men that option can be considered a detention, we believe that it was lawful.

Defendant would not have been permitted to walk from the scene of the traffic stop because, in Officer Driscoll's judgment, under the circumstances, it would have been unsafe and illegal to allow him to leave on foot. Defendant contends that it was not illegal for him to walk along the tollway to the Route 59 exit. We disagree.

Generally, pedestrian use of the tollway is prohibited. I-88 is an Illinois toll highway as defined in section 2(d) of the Toll Highway Act (605 ILCS 10/2(d) (West 2000)). As such, the Illinois State Toll Highway Authority is vested with the power to make and enforce all needful rules and regulations in connection with the operation and management of I-88. See 605 ILCS 10/10(a) (West 2000). One such rule made pursuant to this power is as follows:

> "The following uses of the Tollway, and entry thereon, or on any part of its Right-of-Way are prohibited:
> (a) Pedestrians, except at authorized areas at Oases, Toll Plazas and maintenance areas." 92 Ill. Adm. Code § 2520.201(a) (1999).

■ Defendant argues that there is an emergency exception to the general prohibition of pedestrian use of a tollway. We need not decide whether an emergency exception to the regulation prohibiting pedestrian use of a tollway exists because, irrespective of the existence of such an exception, it would have been illegal for defendant to walk along the tollway under the circumstances. Section 11—1010 of the Vehicle Code provides that "[a] pedestrian under the influence of alcohol or any drug to a degree which renders himself a hazard shall not walk or be upon a highway except on a sidewalk." 625 ILCS 5/11—1010 (West 2002). We disagree with the trial court's conclusion that, although the PBT established that defendant was under the influence of alcohol to such a degree that he could not lawfully operate a vehicle, there was no evidence to show that defendant was under the influence of alcohol to such a degree that rendered him a hazard as a pedestrian. Rather than referring to testimony demonstrating that defendant had the faculties to walk, the trial court simply concluded that there was no evidence to show that defendant was under the influence of alcohol to such a degree that rendered him a hazard as a pedestrian. This factual finding was against the manifest weight of the evidence. The trial court had before it the testimony of an 18-year-veteran policeman who opined that the men would present a hazard if permitted to walk along a 55-mile-per-hour tollway in the dark, while impaired by alcohol, for the one-mile distance to the Route 59 exit. Officer Driscoll testified that he could not allow the men to walk from the scene of the traffic stop because he feared that a motorist would hit them. Driscoll's opinion was based on the PBT results, which indicated that defendant

and the older Reese brother were unfit to operate a motor vehicle, and his observations of the two men who "exhibited no signs of being sober" and "were not showing sober attributes." These facts gave Officer Driscoll reasonable suspicion that defendant would be in violation of section 11—1010 were he to walk from the scene of the traffic stop and, in turn, gave rise to his duty to prevent defendant from doing so. Additionally, we believe that the trial court mischaracterized the evidence when it concluded that Officer Schnizlein's testimony that defendant was free to leave at anytime contradicted Officer Driscoll's testimony that defendant was not legally allowed to walk on the tollway unless sanctioned by the police. Officer Schnizlein never testified that defendant would have been permitted to walk from the scene of the traffic stop. Rather, Schnizlein testified that defendant was free to leave, presumably by any legal means.

We reject defendant's contention that since defendant was with at least one sober companion, the officer's concern for defendant's safety were he permitted to walk was unreasonable. We do not believe that the younger Reese brother's sobriety should have given Officer Driscoll an assurance that no harm would come to defendant, the older Reese brother, or a motorist if the men were permitted to walk from the scene of the traffic stop. Officer Driscoll had no way of determining whether the younger Reese brother, who had no authority over his older brother or defendant, would or could keep his companions out of harm's way.

■ Under the facts of this case, the police officers were justified in detaining defendant based on a reasonable suspicion that criminal activity was about to occur. In *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), the Supreme Court held that, under appropriate circumstances, a police officer may briefly detain a person for questioning if the officer reasonably believes that the person has committed or is about to commit a crime. *Terry*, 392 U.S. at 22, 20 L. Ed. 2d at 906-07, 88 S. Ct. at 1880-81. In Illinois, the *Terry* holding has been codified:

> "A peace officer, after having identified himself as a peace officer, may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, *is about to commit* or has committed an offense as defined in Section 102—15 of this Code, and may demand the name and address of the person and an explanation of his actions. Such detention and temporary questioning will be conducted in the vicinity of where the person was stopped." (Emphasis added.) 725 ILCS 5/107—14 (West 2002).

Once Officer Driscoll realized that all apparent lawful means for

defendant's departure from the roadside had been exhausted, Officer Driscoll had a reasonable suspicion that a violation of section 11—1010 was about to be committed should he drive away and leave defendant behind. Had the police abandoned defendant on the roadside, he would have instantly become a pedestrian who, as we have determined above, likely would have been in violation of section 11—1010. Officer Driscoll's knowledge of these facts gave rise to his duty as law enforcement officer to prevent the men from violating the law by driving the vehicle or walking away from the scene of the traffic stop. See *United States v. Feliciano*, 45 F.3d 1070 (7th Cir. 1995) (*Terry* stop and frisk on suspicion that two men were planning a mugging held not to violate fourth amendment); *Garner v. City of Chicago*, 319 Ill. App. 3d 255, 261-62 (2001); *Banks v. City of Chicago*, 11 Ill. App. 3d 543, 550 (1973). Officer Driscoll's reasonable suspicion that defendant was about to violate section 11—1010 justified detaining defendant to give him a courtesy ride from the roadside to safety. Under these special circumstances, the fact that the detention was not for the purpose of asking defendant questions did not make the detention illegal. See *United States v. Phillips*, 664 F.2d 971, 1023 (5th Cir. 1981) (authorizing a noninvestigatory detention of an individual where no questions were asked but, rather, the purpose of the seizure was to protect a fellow law enforcement agent from an apparent imminent physical threat by that individual).

Irrespective of the officers' reasonable suspicion that an offense was about to be committed, we believe that under the facts of this case, there was an emergency situation that justified a seizure of defendant's person even without a reasonable suspicion that criminal activity was about to be committed. We are aware of no Illinois case declaring that there is an emergency exception to the fourth amendment requirement that a seizure of a person be justified by either probable cause to arrest or a reasonable suspicion of criminal activity. However, for the reasons that follow, we hold that such an emergency exception exists and is applicable here.

■ There is no doubt that there is an exigent circumstances exception to the fourth amendment's warrant requirement (*Payton v. New York*, 445 U.S. 573, 590, 63 L. Ed. 2d 639, 653, 100 S. Ct. 1371, 1382 (1980)), but that exception applies to warrantless searches and seizures when police are acting in a crime-fighting role. Here we are dealing with police conduct unrelated to the investigation and prosecution of crime but, rather, motivated by a concern for the safety of a citizen who found himself in the vulnerable position of being on the roadside while under the influence of alcohol.

In the context of searches, the Supreme Court has recognized an

"emergency" exception to the warrant requirement in instances where police officers "reasonably believe that a person within [a dwelling] is in need of immediate aid." *Mincey v. Arizona*, 437 U.S. 385, 392, 57 L. Ed. 2d 290, 300, 98 S. Ct. 2408, 2413 (1978). " ' The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.' " *Mincey*, 437 U.S. at 392, 57 L. Ed. 2d at 300, 98 S. Ct. at 2413, quoting *Wayne v. United States*, 318 F.2d 205, 212 (D.C. Cir. 1963). Our appellate court has continually recognized this exception in cases where officers reasonably believe that emergencies exist that dictate the need for immediate action to provide aid to persons or property in homes. See *People v. Speer*, 184 Ill. App. 3d 730, 738 (1989); *People v. Koniecki*, 135 Ill. App. 3d 394, 399 (1985); *People v. Bondi*, 130 Ill. App. 3d 536, 539-40 (1984); *People v. Meddows*, 100 Ill. App. 3d 576, 579-81 (1981). In *Speer* this court explained:

> "In emergency cases such as the one presented here, however, where the police testified that the purpose of entering the residence was to check on the welfare of a person, rather than to make an arrest or search for evidence, the issue is not whether there was probable cause to believe a crime had been committed, but whether the police reasonably believed that an emergency existed which required them to act immediately to provide aid to someone in the residence." *Speer*, 184 Ill. App. 3d at 738.

Moreover, the Supreme Court has held that the community caretaking function provides that the police may act in certain situations that are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441, 37 L. Ed. 2d 706, 715, 93 S. Ct. 2523, 2528 (1973). In that case, the Court held that a search of the trunk of a disabled vehicle was not unreasonable under the fourth amendment even though conducted without a warrant. *Cady*, 413 U.S. at 446-48, 37 L. Ed. 2d at 717-19, 93 S. Ct. at 2530-31. The Supreme Court held that the officer was justified in conducting a "caretaking search" of the vehicle because of a concern for the safety of the general public, which might have been endangered if an intruder removed a revolver from the vehicle. *Cady*, 413 U.S. at 447-48, 37 L. Ed. 2d at 718, 93 S. Ct. at 2530-31.

■ While this case involves the lawfulness of a suspicionless seizure of a person rather than the lawfulness of the warrantless searches at issue in the above-cited cases, the rationale in those decisions justifying police action in an emergency that would otherwise be prohibited by the fourth amendment is equally applicable here. In this case, defendant was in need of emergency aid because he found himself on

the side of a high-speed tollway at night without a lawful means of reaching safety while in the vulnerable position of being impaired due to his consumption of alcohol. It is clear that the officers' purpose in interacting with defendant and his companions after the traffic stop had ended was to make sure that they left the roadside by some safe and lawful means, and not to search the men for evidence of criminal activity. The offer of a courtesy ride was not a pretext for the officers' true desire to search defendant and his companions. In fact, Officer Driscoll considered various options for the men to depart from the roadside including driving away in the stopped vehicle, arranging for someone to pick them up at the roadside, and walking to the Route 59 exit. All of these options proved illegal, unsafe, or impossible and the only option left to the stranded men and the police was a courtesy ride in a police vehicle. Where, as here, police action is not motivated by crime detection or investigation but, rather, by an intent to render aid in an emergency situation, a suspicionless seizure of a person in furtherance of that goal does not violate the fourth amendment. Accordingly, we believe that the officers' actions in this case, that is, prohibiting defendant from walking from the scene and providing him with a courtesy ride when all other options for defendant's safe and lawful departure from the roadside were exhausted, amounted to a lawful seizure consistent with the officers' duty to render aid to defendant.

Because we have determined that defendant was not unlawfully detained in this case, his consent was not tainted in the manner that the consent to search was tainted in *Brownlee* (see *Brownlee*, 186 Ill. 2d at 519). Consequently, we hold that defendant voluntarily consented to the pat-down search of his outer clothing for weapons performed incident to the courtesy ride in the police vehicle.

Although not cited by the parties, it is worthwhile to note in passing that the three-prong test announced by our supreme court in *People v. Gonzalez*, 204 Ill. 2d 220 (2003), is inapplicable in this case because here, the relevant police-citizen encounter took place after the traffic stop had ended and after defendant and his companions were told that they were free to make arrangements to leave. The *Gonzalez* test, however, is used to determine the permissible scope of police questioning *during* the course of a traffic stop:

> "[W]e must consider, as an initial matter, whether the question is related to the initial justification for the stop. If the question is reasonably related to the purpose of the stop, no fourth amendment violation occurs. If the question is not reasonably related to the purpose of the stop, we must consider whether the law enforcement officer had a reasonable, articulable suspicion that would

justify the question. If the question is so justified, no fourth amendment violation occurs. In the absence of a reasonable connection to the purpose of the stop or a reasonable, articulable suspicion, we must consider whether, in the light of all the circumstances and common sense, the question impermissibly prolonged the detention or changed the fundamental nature of the stop." *Gonzalez*, 204 Ill. 2d at 235.

We also note that the facts in the case at bar are distinguishable from those in *People v. Bunch*, 207 Ill. 2d 7 (2003), which was handed down by our supreme court after this case was briefed. In *Bunch*, the *Gonzalez* test was applied to determine the lawfulness of an officer's conduct *vis-a-vis* a passenger in a lawfully stopped vehicle. *Bunch*, 207 Ill. 2d at 15-16. The court in *Bunch* determined that the officer's questioning of the defendant prolonged the defendant's detention beyond the completion of the purpose of the stop (*Bunch*, 207 Ill. 2d at 17) because the officer's actions of ordering the defendant to the rear of the vehicle, positioning himself a foot from the defendant, and shining his flashlight in the defendant's face while asking the defendant questions were a " 'show of authority such that a reasonable person would conclude that he or she was not free to leave' " (*Bunch*, 207 Ill. 2d at 19, quoting *Brownlee*, 186 Ill. 2d at 520). In *Bunch* the relevant encounter between the defendant-passenger and the police leading to the discovery of contraband came directly on the heels of the arrest of the driver and was analyzed as a continued detention, which was ultimately held to be impermissibly prolonged. The relevant police-citizen encounter in *Bunch* occurred while the driver was handcuffed and still standing at the rear of the stopped vehicle. *Bunch*, 207 Ill. 2d at 19. In contrast, in the instant case, the traffic stop ended and defendant and his companions were told that they were free to make arrangements to leave the roadside. At that point, the detention pursuant to the traffic stop terminated. Consequently, the police-citizen interaction at issue in the case at bar did not take place during a prolonged detention.

We chose to analyze the encounter between defendant and the police leading to defendant's consent to the pat-down search of his person as a new encounter following the termination of the lawful detention pursuant to the traffic stop. However, we believe that it is important to note that even if we characterized the encounter between defendant and the police as a continued detention, akin to the detention analyzed in *Bunch*, rather than as a new encounter following the termination of the initial lawful detention, the query is the same: was defendant unlawfully detained when he gave voluntary consent to be searched incident to the courtesy ride? See *Bunch*, 201 Ill. 2d at 19

("Given these circumstances, we conclude that the officer's actions constituted a show of authority such that a reasonable person would conclude that he or she was not free to leave"). As we determined above, in this case defendant was lawfully detained upon reasonable suspicion that an offense was about to be committed and, alternatively, because an emergency situation justified the detention.

## B. Exigent Circumstances

Irrespective of the validity of defendant's consent to the pat-down search, we hold that, under the facts of this case, the officers had a duty to remove defendant and the older Reese brother from the roadside after all other apparent lawful means of leaving the roadside had been exhausted. As a matter of first impression in this state, we further hold that the need to transport a citizen in a police vehicle presents an exigent circumstance justifying a minimally intrusive pat-down of the citizen's outer clothing for weapons.

### 1. Duty to Transport

With respect to the duty to transport, we believe that had the officers left these men standing on the roadside, they would have created a situation that was undeniably dangerous to them and to motorists using the tollway. We believe that the holding in *People v. Tobin*, 219 Cal. App. 3d 634, 269 Cal. Rptr. 81 (1990), is instructive on this point.

In *Tobin* the defendant was a passenger in a vehicle stopped by Officer Shabazz for false evidence of registration. *Tobin*, 219 Cal. App. 3d at 636, 269 Cal. Rptr. at 82. The driver of the stopped vehicle had a suspended driver's license. *Tobin*, 219 Cal. App. 3d at 636, 269 Cal. Rptr. at 82. Officer Shabazz told the driver, the defendant, and another passenger that because neither defendant nor the other passenger had a driver's license and because it was deemed unsafe and improper to leave the vehicle on the shoulder of the freeway, the vehicle would be towed. *Tobin*, 219 Cal. App. 3d at 636, 269 Cal. Rptr. at 82. Officer Shabazz offered to call a friend of one of the men to pick them up. *Tobin*, 219 Cal. App. 3d at 636, 269 Cal. Rptr. at 82. Arrangements were made for the three men to be picked up at a Denny's restaurant just off the freeway at an exit about three-quarters of a mile away. *Tobin*, 219 Cal. App. 3d at 636, 269 Cal. Rptr. at 82. Officer Shabazz determined that it would be unsafe for the men to attempt to walk to Denny's because (1) they would have had to cross over two lanes of freeway traffic, (2) walking on the freeway was illegal, and (3) the other passenger appeared to be intoxicated or suffering from a nervous condition. *Tobin*, 219 Cal. App. 3d at 636-37, 269 Cal. Rptr. at 82.

Officer Shabazz explained to the men that they would not be

permitted to walk on the freeway and that he would be happy to transport them to Denny's. *Tobin*, 219 Cal. App. 3d at 637, 269 Cal. Rptr. at 82. The men appeared to understand, and no one objected. *Tobin*, 219 Cal. App. 3d at 637, 269 Cal. Rptr. at 82. Officer Shabazz explained that because they were going to be transported in an uncaged, unmarked police vehicle, they would have to be pat-searched for weapons. *Tobin*, 219 Cal. App. 3d at 637, 269 Cal. Rptr. at 82. The defendant raised no objection. *Tobin*, 219 Cal. App. 3d at 637, 269 Cal. Rptr. at 82. When Officer Shabazz asked the defendant to step out of the vehicle so that he could be pat-searched for weapons, the defendant stepped out of the vehicle. *Tobin*, 219 Cal. App. 3d at 637, 269 Cal. Rptr. at 82. Officer Shabazz said that his impression was that the defendant wanted a ride in the squad car and was submitting to the search. *Tobin*, 219 Cal. App. 3d at 637, 269 Cal. Rptr. at 82. When Officer Shabazz patted the defendant's outer jacket pocket for weapons, he was stuck by a hypodermic needle. *Tobin*, 219 Cal. App. 3d at 637, 269 Cal. Rptr. at 82. After arresting the defendant for possessing the hypodermic needle, a subsequent search of the defendant's person revealed that the defendant possessed cocaine. *Tobin*, 219 Cal. App. 3d at 637, 269 Cal. Rptr. at 83.

The defendant filed a motion to suppress contending that the warrantless search of his person violated the fourth amendment because the officer did not give him the option not to be searched. *Tobin*, 219 Cal. App. 3d at 636, 269 Cal. Rptr. at 82. In affirming the trial court's denial of the defendant's motion to suppress, the *Tobin* court held that the officer had a duty to transport the defendant because (1) the men could not legally drive; (2) it is common knowledge that a tow truck cannot carry three passengers, and even if it could, the officer may have endangered the tow truck driver and subjected the government to potential liability; (3) allowing the defendant to walk on the freeway was dangerous because at the relevant time it was dark and the freeway was heavily traveled, thereby endangering not only the defendant but motorists and subjecting the government to potential liability; and (4) it was generally illegal to walk on the freeway, and the exception to that prohibition was limited to walking on the side of the freeway upon which a vehicle was disabled, and the defendant would have had to traverse lanes of traffic to get to the Denny's restaurant. *Tobin*, 219 Cal. App. 3d at 638-39, 269 Cal. Rptr. at 83-84.

 The facts in this case are substantially similar to those in *Tobin*. Neither defendant nor the Reese brothers could legally drive the stopped vehicle. The limitations with respect to the tow truck's passenger capacity, as well as the potential liability of the officers and their department, were applicable in this case. Allowing defendant and

the Reese brothers to walk along the tollway for the one-mile distance to the Route 59 exit at night and in cold weather was unsafe and generally illegal. Moreover, any emergency exception to the prohibition of pedestrian use of the tollway was not applicable because defendant and the older Reese brother were under the influence of alcohol. If anything, defendant and the older Reese brother, due to their impaired condition as a result of consuming alcohol, presented a greater possibility of personal injury, property loss, or government liability than did the passengers in *Tobin*. Under these circumstances, once all other legal options for the removal of defendant from the roadside were exhausted, the officers' duty to safely do so arose.

## 2. Exigency Justifying the Search

■ With respect to our holding that the duty to transport created an exigency justifying the pat-down search for weapons, we are persuaded by the rationales in decisions of other state courts finding that the need to transport a person in a police vehicle is an exigency that justifies a pat-down search for weapons. See *State v. Lombardi*, 727 A.2d 670, 674 (R.I. 1999); *Tobin*, 219 Cal. App. 3d at 641, 269 Cal. Rptr. at 85; *People v. Hannaford*, 167 Mich. App. 147, 152, 421 N.W.2d 608, 610 (1988). In *Tobin*, the court noted that "[t]he appellate courts of [California] have long recognized that the need to transport a person in a police vehicle in itself is an exigency which justifies a pat search for weapons." *Tobin*, 219 Cal. App. 3d at 641, 269 Cal. Rptr. at 85.

Further instructive on this point is the Supreme Court of Rhode Island's rationale in *Lombardi*, where the defendant was an "inebriated" passenger in a vehicle stopped by police for a traffic violation. *Lombardi*, 727 A.2d at 671-72. After placing the driver under arrest for operating a vehicle with a suspended driver's license, the arresting officer decided that, because the defendant was intoxicated, it was best for the defendant's own safety that another officer drive the defendant home. *Lombardi*, 727 A.2d at 672. When this was explained to the defendant, he did not object. *Lombardi*, 727 A.2d at 672. When the defendant was told that, prior to getting into the police cruiser, he would have to be patted down for weapons that could endanger the officer while he was driving, the defendant voiced no objection. *Lombardi*, 727 A.2d at 672. The pat-down search revealed that the defendant was in possession of cocaine. *Lombardi*, 727 A.2d at 672. The defendant contended on appeal that the pat-down search was unlawful because the officer lacked reasonable suspicion that the defendant was armed and dangerous. *Lombardi*, 727 A.2d at 673.

After citing decisions of the United States Supreme Court recognizing that, during a traffic stop, passengers present a danger to police

officers (*Maryland v. Wilson*, 519 U.S. 408, 415, 137 L. Ed. 2d 41, 48, 117 S. Ct. 882, 886 (1997) ("an officer making a traffic stop may order passengers to get out of the car pending completion of the stop"); *Michigan v. Long*, 463 U.S. 1032, 1047-48, 77 L. Ed. 2d 1201, 1218-19, 103 S. Ct. 3469, 3480 (1983) (police may order persons out of an automobile during a traffic stop because of the inordinate risk confronting an officer as he approaches a person seated in an automobile)), the *Lombardi* court held that the same concern for officer safety justifies the minimal intrusion presented by the pat-down search incident to being transported in a police vehicle. *Lombardi*, 727 A.2d at 674. The court wrote:

"We believe because of the exigency then present before him, that Officer Martin was justified in determining for himself that before ordering his fellow officer to drive the intoxicated defendant home in a police vehicle, he could be assured that the defendant had nothing on his person that might pose a danger to the life or well-being of the driver officer.

On the particular facts present in this case, we believe that the slight intrusion involved here is not the sort of arbitrary interference by a law officer that the Fourth Amendment condemns. This is not a true *Terry v. Ohio*, [citation] bulging-pocket-type intrusion. The police officer here was not looking to arrest or charge the defendant, he was simply trying to assist the defendant in getting to his home which was some miles away. It was one-thirty in the morning, in an area not well suited to early morning walkers, the defendant was intoxicated, and his friend's car was about to be impounded. On these facts, had the police officer let the intoxicated defendant walk or stumble home \*\*\*, the officers would have been subjected to severe criticism or an action for damages if either the defendant or another person had been injured or killed. The slight pat-down search in this case was certainly of the exigent-circumstance-type anticipated to be valid in *Terry*.

\*\*\*

We note that Officer Martin, on the particular facts here, did not have to limit his suspicion or his precaution concern simply to ascertaining whether the defendant had a gun protruding from his belt or a *Terry* bulging pocket. An ordinary pen or pencil, when plunged into the neck of the police officer by an intoxicated passenger seated in the backseat of the police cruiser, would have been as lethal as any handgun. The pen or pencil would have presented no *Terry* 'bulge.' " *Lombardi*, 727 A.2d at 674.

The defendant in *Hannaford* was one of three passengers traveling in a vehicle whose driver was arrested for drunk driving. *Hannaford*, 167 Mich. App. at 148, 421 N.W.2d at 608. After the arresting officer

determined that the vehicle would have to be impounded because the three passengers were without valid driver's licenses, the defendant asked how they were going to get home. *Hannaford*, 167 Mich. App. at 148, 421 N.W.2d at 608. The officer told them that they could either walk, be transported to a nearby restaurant, or be transported to the police station to arrange for transportation. *Hannaford*, 167 Mich. App. at 148-49, 421 N.W.2d at 608. The three passengers accepted a ride from the officer to the restaurant. *Hannaford*, 167 Mich. App. at 149, 421 N.W.2d at 608. None of the passengers appeared armed and dangerous. *Hannaford*, 167 Mich. App. at 149, 421 N.W.2d at 609. "Because of the late hour, the fact that the men had been drinking, and because he could not contain their movement in the patrol car, [the transporting officer] told the passengers they would have to be patted down before entering his patrol car. None objected or left the scene." *Hannaford*, 167 Mich. App. at 149, 421 N.W.2d at 609. During the pat-down, a pistol was discovered in the defendant's overcoat pocket. *Hannaford*, 167 Mich. App. at 149, 421 N.W.2d at 609. In rejecting the defendant's appellate contention that the pistol should have been suppressed as the product of an illegal pat-down under *Terry*, the Court of Appeals of Michigan wrote:

> "In the instant case, we do not believe that the limited intrusion created by the pat-down search for weapons was, on balance, an unreasonable search under the circumstances. *** The Fourth Amendment was surely not intended to stand for the proposition that police officers must either abandon civilians on highways at night or transport them at the risk of personal safety, rather than transport them at reduced risk of personal safety by first subjecting them to a frisk for weapons." *Hannaford*, 167 Mich. App. at 152, 421 N.W.2d at 610.

We are aware of the contrary decision of *State v. Hart*, 249 Wis. 2d 329, 345, 639 N.W.2d 213, 220 (App. 2001), where the Court of Appeals of Wisconsin, citing the plurality opinion of the Wisconsin Supreme Court in *In re Kelsey C.R.*, 243 Wis. 2d 422, 626 N.W.2d 777 (2001), held that "the law in Wisconsin is that the need to transport a person in a vehicle is not, in and of itself, an exigency which justifies a search for weapons." *Hart*, 249 Wis. 2d at 345, 639 N.W.2d at 220. A plurality in *Kelsey C.R.* declined to adopt a blanket rule that a police officer may frisk a person just because the officer is going to place that person inside a police vehicle because such a rule might be found to eliminate the constitutional requirement that a search be reasonable. *Kelsey C.R.*, 243 Wis. 2d at 456, 626 N.W.2d at 793. On this issue, however, we find the concurrence in *Kelsey C.R.* better reasoned. After recognizing that the touchstone of any fourth amendment analysis is always

"reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security" and that reasonableness depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers" (*Kelsey C.R.*, 243 Wis. at 457, 626 N.W.2d at 794 (Sykes, J., concurring, joined by Prosser, J.), citing *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09, 54 L. Ed. 2d 331, 335-36, 98 S. Ct. 330, 332, (1977), citing *Terry*, 392 U.S. at 19, 20 L. Ed. 2d at 904, 88 S. Ct. at 1878-79, and *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 45 L. Ed. 2d 607, 615, 95 S. Ct. 2574, 2579 (1975)), Justice Sykes wrote:

> "I would conclude that when a law enforcement officer has an objectively reasonable need or basis to transport an individual in his squad car, the officer's paramount interest in protecting himself against attack by his passenger outweighs the individual's interest in being free from the personal intrusion of a weapons frisk. This is not dependent upon any suspicion that the person being transported is armed and dangerous. *Terry*'s requirement of a reasonable suspicion for a weapons frisk in connection with an investigative stop properly balances the relative interests at stake in that sort of police-citizen encounter in the field.
>
> But when an officer is called upon in the course of his duties to transport an individual in a squad car, he necessarily exposes himself to greater risks than the ordinary field investigation. He will have his hands on the wheel, his eyes on the road, and his back to his passenger, and, as such, is extremely vulnerable to assault, much more so than in an ordinary field investigation. Under these circumstances, I have no difficulty concluding that a weapons frisk, even absent reasonable suspicion that the passenger-to-be is armed and dangerous, is perfectly reasonable under the Fourth Amendment.
>
> This is not to say that I would find *every* search-incident-to-squad car-ride reasonable. There must be an objectively reasonable need or basis for providing the ride in the first place before the prospective passenger can reasonably be subjected to a weapons frisk. It cannot be pretextual. An officer cannot convert a routine traffic stop or field investigation into an opportunity to search by conjuring up a reason to provide a ride." (Emphasis in original.) *Kelsey C.R.*, 243 Wis. at 458-59, 626 N.W.2d at 794 (Sykes, J., concurring, joined by Prosser, J.).

We find the above analysis sound and adopt it here. Therefore, we hold that in this case a duty to transport defendant arose and that the need to transport defendant in a police vehicle was an exigent circumstance justifying the pat-down search of defendant's outer clothing for weapons.

## III. CONCLUSION

For the foregoing reasons, we reverse the judgment of the circuit court of Du Page County granting defendant's motion to quash arrest and suppress evidence, and we remand the cause for further proceedings.

Reversed and remanded.

O'MALLEY, J., concurs.

JUSTICE BYRNE, dissenting:

I agree with the majority that the trial court found that defendant consented to the search that led to the discovery of the firearm. However, I believe that the trial court also concluded that the consent was tainted by the officers' detention of defendant following the original traffic stop. First, I respectfully dissent because I conclude that the trial court's finding is not against the manifest weight of the evidence. Second, I conclude that the majority has needlessly (1) raised the issue of whether an officer has a "duty to transport" a "stranded" person; (2) found that the officers had such a duty in this case; and (3) found that the existence of the duty created exigent circumstances justifying the pat-down search for weapons.

## A. Consent

At the suppression hearing, the State had the burden of proving that defendant's consent to the search was voluntary. See *Anthony*, 198 Ill. 2d at 202. I agree with the majority's characterization of one of the trial court's findings: defendant consented to the search and was not merely acquiescing to Officer Schnizlein's apparent authority. However, I do not subscribe to the majority's notion that the trial court's distinction of this case from *Anthony* is tantamount to a finding that defendant's consent was valid. I believe that the trial court granted the motion to suppress because it found the consent to be tainted by an illegal detention (see *Brownlee*, 186 Ill. 2d at 519), and I conclude that the finding is not against the manifest weight of the evidence.

The majority holds that the police-citizen encounter changed from a *Terry* stop to a community caretaking situation when the original traffic stop ended. " '[A] person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " *Murray*, 137 Ill. 2d at 389, quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 64 L. Ed. 2d 497, 509,

100 S. Ct. 1870, 1877 (1980). A police-citizen encounter presents a community caretaking situation if the citizen is free to leave the scene. In this case, defendant was "free to leave" the scene of the traffic stop only under certain conditions. Officer Driscoll prevented defendant from driving away in the seized vehicle because he was too intoxicated to drive, and Driscoll would have prevented defendant from walking from the scene on foot if defendant had attempted to do so because the officer believed that (a) defendant was too intoxicated to walk safely and (b) no pedestrians are permitted on toll highways. Although Schnizlein testified that defendant was "free to leave" the scene, the trial court, in judging the credibility of the witnesses, determined that defendant would have been arrested if he had attempted to drive or walk away. Defendant did not attempt to drive the seized vehicle from the scene, and it is undisputed that his PBT results would have provided probable cause to arrest him for DUI if he had attempted to do so. However, I conclude that, if Officer Driscoll wrongly prevented defendant from walking from the scene, this detention would have tainted defendant's consent to the pat-down search before he entered the squad car.

### 1. Intoxicated Pedestrian on Highway

Section 11—1010 of the Vehicle Code provides that "[a] pedestrian who is under the influence of alcohol or any drug to a degree which renders himself a hazard shall not walk or be upon a highway except on a sidewalk." 625 ILCS 5/11—1010 (West 2002). Driscoll testified only that defendant "exhibited no signs of being sober" and failed a PBT, which is designed to investigate whether a person is too intoxicated to drive. However, the officers admitted that defendant was cooperative, and there was no affirmative evidence of defendant's appearance or demeanor that would suggest that he could not walk safely. The trial court held that there was inadequate evidence of defendant's intoxication to justify the detention, and I conclude that the court's factual finding is not against the manifest weight of the evidence.

After holding that the encounter was a community caretaking situation in which defendant was not seized, the majority incongruously concludes that the officers had a reasonable suspicion that defendant was about to violate section 11—1010 of the Vehicle Code and that this suspicion justified defendant's seizure. The analysis on this point is dispositive, but the majority nevertheless states in *dicta* that "under the facts of this case there was an emergency situation that justified a seizure of defendant's person even without a reasonable suspicion that criminal activity was about to be committed." 346

Ill. App. 3d at 160. I agree with the majority that there is no Illinois authority discussing whether such an exception exists, and I believe that we should not create one here *sua sponte,* where we lack the benefit of the parties' argument on the extraneous issue.

## 2. Stranded Pedestrian on Toll Highway

The State alternatively argues that defendant's consent was valid because he was properly detained as an illegal pedestrian on the toll highway. The trial court held that section 11—1007 of the Vehicle Code permitted defendant to walk from the scene and that defendant did not knowingly consent to the search because Officer Driscoll incorrectly implied that he could not walk from the scene. Section 11—1007 of the Vehicle Code provides as follows:

"Pedestrians walking on highways. (a) Where a sidewalk is provided and its use is practicable, it shall be unlawful for any pedestrian to walk along and upon an adjacent roadway.

(b) Where a sidewalk is not available, any pedestrian walking along and upon a highway shall walk only on a shoulder, as far as practicable from the edge of the roadway.

*(c) Where neither a sidewalk nor a shoulder is available, any pedestrian walking along and upon a highway shall walk as near as practicable to an outside edge of a roadway, and, if on a two-way roadway, shall walk only on the left side of the roadway.*

(d) Except as otherwise provided in this Chapter, any pedestrian upon a roadway shall yield the right-of-way to all vehicles upon the roadway." (Emphasis added.) 625 ILCS 5/11—1007 (West 2000).

Section 11—1007(c) does not bar a person from walking from a disabled vehicle, similar to the seized vehicle here, to the nearest highway exit ramp. When Driscoll informed defendant that he could leave the scene only as a passenger in a vehicle, the officer implied that defendant was not free to walk to the exit. It was in this context that defendant submitted to the search that disclosed the gun.

The trial court afforded the State several opportunities to cite authority that criminalizes the act of walking along a toll highway when no other means of transportation are available, but the State failed to do so. The majority now cites the general prohibition of a pedestrian's use of a toll highway (see 92 Ill. Adm. Code § 2520.201(a) (1999)) but declines to respond to defendant's contention that an exception to the rule exists for pedestrians who are stranded. The majority's analysis borders on judicial advocacy and is troubling in light of its unnecessary creation of the emergency exception to the rule barring the seizure of a person absent probable cause, reasonable suspicion, or a warrant.

Administrative rules and regulations have the force and effect of

law and must be construed under the same standards that govern the construction of statutes. *People v. Bonutti*, 338 Ill. App. 3d 333, 341 (2003). Therefore, the primary objective of interpreting a regulation is to ascertain and give effect to the intent of the drafters. The best indication of what the drafters intended is the regulatory language itself. Clear and unambiguous terms are to be given their plain and ordinary meaning, and where regulatory provisions are clear and unambiguous, the plain language as written must be given effect, without reading into it exceptions, limitations, or conditions that the drafters did not express. *Bonutti*, 338 Ill. App. 3d at 341.

The Administrative Code proscribes "[p]edestrians, except at authorized areas at Oases, Toll Plazas and maintenance areas," from entering or using the toll highway. 92 Ill. Adm. Code § 2520.201 (1999). Section 2520.110 of the Administrative Code does not define "[p]edestrian" but provides that "[a]ny and all terms that are not specifically defined in this Section shall have the meanings ascribed to them in the Illinois Vehicle Code and the Toll Highway Act." 92 Ill. Adm. Code § 2520.110 (1999). The Vehicle Code defines "pedestrian" as "[a]ny person afoot, including a person with a physical, hearing, or visual disability." 625 ILCS 5/1—158 (West 2000).

"Any person using any part of the Tollway or Right-of-Way except as herein provided [in the Administrative Code] is guilty of a trespass" (92 Ill. Adm. Code § 2520.302 (1999)) and subject to prosecution under section 21—3 of the Criminal Code of 1961 (720 ILCS 5/21—3 (West 2000)). 92 Ill. Adm. Code § 2520.305 (1999). Section 21—3 "does not prohibit a person from entering *** upon the land of another for emergency purposes." 720 ILCS 5/21—3(f) (West 2000). "Emergency" means a condition or circumstance in which an individual is or is reasonably believed by the person to be in imminent danger or serious bodily harm or in which property is or is reasonably believed to be in imminent danger of damage or destruction. 720 ILCS 5/21—3(f) (West 2000).

Although defendant did not testify to his mental state in this case, Officer Driscoll testified that he was concerned for defendant's safety because of the late time of night, poor lighting, low temperature, and high speed of the vehicles on the tollway. I conclude that the officer's testimony supports a factual finding that defendant's presence on the tollway was excused by the emergency situation that the majority concedes existed.

I further note that, even if a pedestrian stranded on the tollway commits a trespass if he walks to the nearest exit, the chapter of the Administrative Code that might proscribe such conduct did not authorize Officer Driscoll to arrest defendant merely for his presence

on the tollway after the traffic stop. The enforcement of the relevant portions of the Administrative Code is limited as follows:

"(a) For the purpose of giving notice of acts declared unlawful by this Subpart C, the Authority hereby authorizes each and every Director, officer and employee of the Authority and each and every member of the Illinois State Police, District 15, having knowledge of such an unlawful entry upon the Right-of-Way of the Tollway to promptly notify such persons to depart from such Authority property.

(b) After being notified by any Director, officer or employee of the Authority or by a member of the Illinois State Police, District 15, as provided in subsection (a) above, any person who fails or refuses to immediately depart from such land is subject to arrest and/or immediate removal from Authority Right-of-Way, and shall be subject to prosecution for trespass.

(c) The Illinois State Police, District 15, are authorized to enforce the provisions of Subpart C, after verbal notice as provided above, or without verbal notice in cases where written notice forbidding entry in the area is posted." (Emphasis added.) 92 Ill. Adm. Code § 2520.303 (1999).

Here, Officer Driscoll was a member of the Naperville police department, but the enforcement of the section governing trespassing pedestrians is limited to members of the Illinois State Police, District 15. See 92 Ill. Adm. Code § 2520.303 (1999).

## B. Exigent Circumstances

After concluding that defendant's consent to the search was not tainted by the detention, the majority states in *dicta* that "the officers had a duty to remove defendant and the older Reese brother from the roadside after all other apparent lawful means of leaving the roadside had been exhausted." 346 Ill. App. 3d at 164. I disagree with the majority's decision to needlessly impose a new duty and grant the concomitant authority to search based upon the exigent circumstances of a citizen's entry into a police car.

In *Tobin*, the California Court of Appeals held that the police officer had a duty to transport a person who was stranded after the vehicle in which he was riding was stopped and towed. *Tobin*, 219 Cal. App. 3d at 638-39, 269 Cal. Rptr. at 83-84. In reaching its holding, the court cited only a treatise for the proposition that the government would be exposed to liability if the officer did not transport the defendant. Instead, the court emphasized the undisputed fact that the defendant could not walk on the road legally. Here, however, the emergency exception to the criminal trespass statute would have permitted defendant to walk along the tollway. See 720 ILCS 5/21—

3(f) (West 2000). I find *Tobin* to be factually distinguishable and generally unpersuasive, and I question the majority's reliance upon the case in light of the dearth of briefing on this issue.

The majority cites *Hannaford* for the proposition that defendant's entry into the police car created the exigency justifying the search. However, in *Hannaford*, the transporting officer expressly gave the defendant the option of walking from the scene. *Hannaford* presented a true community caretaking encounter, unlike this case, where the majority holds that defendant could be seized because his intoxication gave the officers reasonable suspicion that he was about to commit a crime by walking on the tollway. The *Hannaford* court emphasized that, before entering the police car, "[n]one objected or left the scene." *Hannaford*, 167 Mich. App. at 149, 421 N.W.2d at 609. Defendant was not afforded similar choices in this case.

In *Hart*, the Wisconsin Court of Appeals declined to adopt a blanket rule permitting the search of every citizen entering a squad car. The Hart court noted that "a routine pat-down of a person before a police officer places the person in a squad car is wholly reasonable. We recognize that police policy mandates pat-downs for the general safety of the officer. Nevertheless, evidence gleaned from such a search will only be admissible in court if there are particularized issues of safety concerns about the defendant." *Hart*, 249 Wis. 2d at 345-46, 639 N.W.2d at 220. Therefore, if the true motivation of the search-incident-to-police-car-ride is officer safety rather than criminal investigation, the State should have no objection to suppressing the fruits of a search conducted without reasonable suspicion of criminal activity. *Hart* presents an alternative to the majority's holding in this case, but I neither endorse nor reject *Hart* because I conclude that these issues need not be decided here.

## C. Conclusion

In conclusion, I reject the State's proposition that the officers could have arrested defendant if he had attempted to walk from the scene. The trial court was not manifestly erroneous in concluding that defendant's due process rights were violated and his consent was invalid because Officer Driscoll incorrectly implied that he was not free to leave the scene on foot. See generally *People v. Daugherty*, 161 Ill. App. 3d 394, 398-400 (1987) (when a law enforcement officer uses deception and his official position to induce a defendant to consent to a search, the search may be coercive and the consent invalid). The majority has unnecessarily and substantially curtailed the fourth amendment protections of motorists who become stranded on this state's roadways. The sweeping new rules announced herein authorize

176

the government to search pedestrians under the guise of providing a "courtesy ride" during a community caretaking encounter. This opinion could be construed as condoning the seizure and search of any person whose status as a stranded pedestrian, in the officer's sole opinion, creates a risk of harm to the pedestrian or other motorists. I conclude that the motion to suppress was correctly granted in this case, and for the preceding reasons, I respectfully dissent.